[Cite as *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247.]

THE STATE OF OHIO, APPELLEE, *v*. GROUP, APPELLANT.

[Cite as *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247.]

*Criminal law — Aggravated murder — Intimidation — R.C. 2921.03(A) — Death penalty upheld, when.*

(No. 1999-1152 — Submitted September 24, 2002 — Decided December 30, 2002.)

APPEAL from the Court of Common Pleas of Mahoning County, No. 97-CR-66.

_____

**Lundberg Stratton, J**.

{¶1}   On January 18, 1997, the appellant, Scott A. Group, shot Robert Lozier to death during a robbery.  Group was convicted of aggravated murder and sentenced to death.

{¶2}   Robert Lozier's wife, Sandra Lozier, owned the Downtown Bar in Youngstown, Ohio.  In late September 1996, the Loziers began buying wine and other merchandise from Ohio Wine Imports Company.  Group, who was then employed as a deliveryman for Ohio Wine, made weekly deliveries to the Downtown Bar.  Group never asked the Loziers to sign or initial a copy of the invoice when they took delivery, a practice Mrs. Lozier characterized as unusual.

{¶3}   On December 12, 1996, Group brought his cash receipts to the Ohio Wine warehouse manager's office to be counted and compared against his invoices.  Group's cash receipts were approximately $1,300 short.  Although the police were notified, Group was never charged with stealing the missing money.

{¶4}   About a week before Robert Lozier's murder, Group went to the Downtown Bar and asked Mrs. Lozier to show him the bar's copies of invoices from Ohio Wine.

{¶5}    Less than a week before Robert Lozier's murder, two Ohio Wine employees saw Group with a revolver at work.  They told him to take the gun out of the building, since possessing a firearm in the warehouse was illegal.

{¶6}    The day before the murder, Group quit his job at Ohio Wine.  That night, two witnesses saw Group at the Downtown Bar.  One of them, Robert Genuske, who worked at the bar, recalled that a few weeks earlier, Group had come to the bar looking for Mr. or Mrs. Lozier because he wanted to talk to them about an invoice.

{¶7}    The next day, January 18, the Loziers arrived at the Downtown Bar around 10:00 a.m.  It was a cold day and Robert Lozier went upstairs to see whether the pipes had frozen.  Sandra Lozier went to an office, opened a safe, removed five bags containing approximately $1,200 to $1,300 in cash, and set them on her desk.

{¶8}    As she counted the cash, Mrs. Lozier heard a knock at the bar's front door.  She went to the door, looked through the peephole, and saw Group.  Mrs. Lozier recognized Group and let him in.  She noted that he was wearing tennis shoes, jeans, a dark blue sweatshirt, and an undershirt.  She particularly noticed that he wore both a sweatshirt and an undershirt because Group "never dressed that warmly."

{¶9}    Group told Mrs. Lozier that he wanted to check the invoices again.  Mrs. Lozier led him to the office.  As Mrs. Lozier and Group searched through the invoices, Robert Lozier came into the office, sat at the desk, and took over counting the money.  As Mrs. Lozier later testified, "[Group] just kept going through [the invoices], and it was like he just kept staring at them."

{¶10}    Asking to use the restroom, Group left the office briefly.  When he returned, he had a gun.  Group ordered the Loziers to put their  hands up and get into the restroom.  Mrs. Lozier told Group to take the money, but Group replied,

"This isn't about money." He forced the Loziers into the restroom at gunpoint and made them put their hands against the wall.

{¶11} Group stated that "he was the brother of the girl that was missing." Mrs. Lozier interpreted this as a reference to Charity Agee, a murder victim who had last been seen at the Downtown Bar on New Year's Eve. The Loziers turned around, but Group ordered them to face the wall. Then he shot them both. He shot Robert Lozier once in the head. He shot Sandra Lozier twice: once in the back of the neck and once near her temple.

{¶12} Mrs. Lozier lost consciousness. She woke to find her husband dead on the floor. Mrs. Lozier thought she was dying, so she tried to write "Ohio Wine" on the floor in her own blood as a clue for the police. At the time, she did not know Group's name. She then crawled to the office, where she managed to dial 911. She told the operator that "the delivery man from Ohio Wine" had shot and robbed her and her husband. The 911 call was recorded; a voice timestamp on the tape established that the call was received at 11:05 a.m.

{¶13} The first Youngstown police officer to arrive at the crime scene was Detective Sergeant Joseph Datko. Mrs. Lozier told Datko: "The Ohio Wine man shot me. The Ohio Wine man. Our delivery man shot us." The money the Loziers had been counting before the shootings was gone and so was the box of invoices that Group had been looking through.

{¶14} At trial, Group, his family, and a family friend gave a different account of Group's whereabouts. Group testified that, after driving his foster son to work around 7:30 a.m., he went back to his apartment, gathered some dirty laundry, and went to his mother's house to wash it, arriving around 9:00 or 9:30 a.m. He testified that he did not know what time he had left his mother's house. Group's mother, grandmother, and sister were at Group's mother's house that morning, along with Francisco Morales, a friend of the Group family. The

accounts given by these witnesses generally indicated that Group had arrived at his mother's house by 9:00 a.m. and had left between 11:30 and 11:40 a.m.

{¶15} According to Group, after leaving his mother's house, he drove to the Diamond Tavern in Campbell, Ohio. Group testified that he did not know how long he was at the tavern but that he had left at noon.

{¶16} There were about eight customers at the Diamond Tavern. Group bought at least two rounds of drinks for all of the customers. A fellow patron thanked Group and said, "I'll see you," but Group replied, "You aren't going to see me anymore." He had a similar exchange with the bartender, Bonnie Donatelli.

{¶17} Group then drove to the VFW post, which took about five minutes. The manager, Maria Dutton, was a friend of Group's. According to Dutton, Group arrived slightly after noon and left at 12:55 p.m. While there, Group bought a round of drinks for everyone.

{¶18} Group then drove to a grocery store and telephoned his mother. According to his mother, she received the call between 1:00 and 1:30 p.m. Mrs. Group told her son that Youngstown police were looking for him in connection with a shooting downtown. According to Group, he knew that he had not been downtown, so he surmised that his mother misunderstood the situation and that the police were actually looking for him because of some unpaid parking tickets. Group told his mother that he would go to the police station. Group's mother and sister intercepted him en route and went to the station with him.

{¶19} When Group arrived at the police station, he spoke with Captain Robert Kane, chief of detectives, and Detective Sergeant Daryl Martin. Kane and Martin noticed what looked like blood on one of Group's tennis shoes. When questioned about it, Group told Kane that he had cut his finger. He showed Kane the finger, and there was a cut on it, but it "looked like a superficial old cut" to Kane.

{¶20} After brief questioning, Sergeant Martin arrested Group. Group said, "You better check out Sam Vona," a former driver for Ohio Wine. But Mrs. Lozier did not recognize Vona's picture when Martin later showed it to her.

{¶21} Group's shoe was sent to Cellmark Diagnostics for DNA testing. An expert from Cellmark testified that the DNA pattern of the blood on the shoe matched the DNA pattern of a known sample of Robert Lozier's blood. She further testified that the same DNA pattern occurs in approximately 1 in 220,000 Caucasians, 1 in 81 million African-Americans, and 1 in 1.8 million Hispanics. The testing also revealed that Group was excluded as the source of the blood.

{¶22} Lisa Modarelli, an Ohio Wine sales representative, was a friend of Group's. According to Modarelli, Group confided to her that police had swabbed his hands to test for gunshot residue and that he was concerned that the test might be positive because he had been shooting a gun the day before the murder with "a friend." Later, Group told Modarelli that he had been shooting with his foster son, but Group's foster son denied that he had gone shooting with Group.

{¶23} Group contacted Bonnie Donatelli from jail and asked her to contact Darryl Olenick for him. Olenick was a regular at the Diamond Tavern; his hobbies were gun collecting and target shooting. Group told Donatelli that the police had found gunshot residue on his hands and asked Donatelli to get Olenick to tell police that he and Group had been target shooting together the day before the murder. In fact, Olenick and Group did not associate outside the tavern and had never gone shooting together. Donatelli promised to "see what [she] could do," but instead, she told Sergeant Martin about Group's request.

{¶24} Robert Clark was an inmate at the Mahoning County Jail with Group. Clark mentioned to Group that he "was familiar with the people in the [Downtown] [B]ar." Group asked Clark whether he would "be willing to help [Group] out." Group then made up a story for Clark to tell police. Clark was to say that he had been near the Downtown Bar on the morning of the murder and

had seen a man leave the bar carrying a large beer bottle box. In return, Group promised to help Clark "any way he could." Clark later received an anonymous $50 contribution to his commissary account.

{¶25} Adam Perry was another Mahoning County Jail inmate at the time of Group's pretrial incarceration. Awaiting trial on pending charges, Perry was incarcerated with Group from December 1997 to May 1998. Perry was released on bond in May 1998.

{¶26} In a letter postmarked March 20, 1998, before Perry's release, Group begged for Perry's help with his case:

{¶27} "If you do bond out, let me know. There's something you may be able to do to help me with concerning my case. And I'm telling you, I need all the help I can get. * * * But seriously man, and this is no joke, I need your help with something if you get out. Please don't leave me hanging? We've known each other a long time and if anyone in your family needs help, you know I'll be there."

{¶28} Before Perry was released, Group asked him to firebomb Mrs. Lozier's house. Group assured Perry that Mrs. Lozier no longer lived there. However, he told Perry that "[h]e didn't want Sandy Lozier to testify against him," and he wanted Perry to "firebomb the lady's house to either scare her from testifying or to lead the police into investigating others."

{¶29} Group told Perry that he had $300,000 hidden away. He offered Perry half of it in exchange for his help. Group also offered to dissuade a witness from testifying in Perry's trial.

{¶30} Group explained to Perry how to make a firebomb by mixing gasoline with dish soap in a bottle, with a rag in the neck for a fuse. He instructed Perry to light the rag and throw it through the front window and then to drop a key chain with the name "Charity" on it on the front lawn. "[W]hat he wanted to

do," Perry explained, "was to mislead the police into thinking that the firebomb and the murder was [sic] all involved as far as Charity's abduction and murder."

{¶31} In a letter postmarked May 6, 1998, Group wrote to Perry: "So I need to know on everything if that party is still on where your sister lived. The party has to happen and happen the way we last talked. I've got to know bro, so I can figure some other things out in the next few weeks." Perry understood "the party" to refer to the planned firebombing of Mrs. Lozier's house.

{¶32} Group also corresponded with Perry after Perry's release. State's Exhibit 37, a letter from Group to Perry, contains the following passage: "[Y]ou said you would take care of that flat tire for me and now that your [sic] out, I hope you do because it's a matter of life or death (mine)[.]" In the next sentence, Mrs. Lozier's address appears next to the name "Agee."

{¶33} Group then wrote: "If you take care of the flat, please take care of it with that two step plan we talked about. * * * Theres [sic] $300,000.00 in a wall of a certain house * * * . Half goes to you to do what you like."

{¶34} The second page of State's Exhibit 37 contains Mrs. Lozier's address and describes the house as ranch-style. It also lists the following items: "Cheap key chain or ID bracelet—name (Charity)" and "3 liter wine jug—mix gas & dish soap."

{¶35} In June 1998, Perry knocked on Mrs. Lozier's door. When she answered, he asked her whether a "Maria something lived there." Mrs. Lozier said no, and Perry left. Perry testified that he did not want to hurt Mrs. Lozier and so, after finding her at home, he took no further action. Perry later told the prosecutor about Group's plan.

{¶36} Group was indicted for the aggravated murder of Robert Lozier under R.C. 2903.01(B). The aggravated-murder count had two death specifications: R.C. 2929.04(A)(5) (purposeful attempt to kill two persons) and R.C. 2929.04(A)(7) (murder during aggravated robbery). The indictment also

contained a count charging Group with the attempted aggravated murder of Mrs. Lozier on January 18, 1997, and a count charging aggravated robbery, R.C. 2911.01(A)(1). Each count had a firearm specification, R.C. 2941.145(A).

{¶37} After Perry told the prosecutor about the firebombing plan, a superseding indictment was filed, containing the above counts plus two new ones: (1) the attempted aggravated murder of Mrs. Lozier "on or about or between April 1, 1998 and June 5, 1998," and (2) one count of intimidating a witness—Mrs. Lozier—"on or about or between December 1, 1997 and June 5, 1998."

{¶38} Group was convicted on all counts and specifications. After a penalty hearing, he was sentenced to death.

I

Jury Issues

{¶39} In his first proposition of law, Group contends that it was improper to dismiss jurors for cause because they expressed reservations about capital punishment. See, generally, *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581; *Wainwright v. Witt* (1985), 469 U.S. 412, 420, 424-426, 105 S.Ct. 844, 83 L.Ed.2d 841. In this proposition, however, Group fails to identify any prospective juror who was dismissed on the basis of his views opposing capital punishment.

{¶40} In his fourth proposition, Group does identify such a juror. He contends that prospective juror No. 389 was improperly excused for cause because of her opposition to the death penalty.

{¶41} Prospective juror No. 389 stated that although she did not believe in capital punishment, she could vote for it "[w]hen the state proves it to me." She also stated that in order for the state to prove it to her, it would have to present more than one eyewitness to the crime:

{¶42} "Q   What kind of proof do you think you would want?

{¶43} "A   Hard evidence that he really did this.

**{¶44}** "Q    Like what?

**{¶45}** "A      Like what?

**{¶46}** "Q      Yeah.

**{¶47}** "A    I don't know.

**{¶48}** "* * *

**{¶49}** "Q    How about an eyewitness?

**{¶50}** "A    A couple.  Not one.  I will need more than one.

**{¶51}** "* * *

**{¶52}** "Q     If I only had one eyewitness, that would not be enough?

**{¶53}** "A      That's his word against my word.  Like, I'd have to weigh it.  I really need more than one."

**{¶54}** The prosecutor also asked the prospective juror, "What if I told you that we don't have the gun that was used to kill Mr. Lozier."  The prospective juror's response was "How can you prove that he—that he did something if you don't have the gun?"

**{¶55}** The state challenged prospective juror No. 389 for cause.  In ruling on the challenge, the trial judge expressed her concern that, although the prospective juror had indicated that she would follow the law in the penalty phase, she would not follow the law in the guilt phase but would hold the state to a higher burden of proof than the law prescribed.  The judge concluded: "I don't think that she understands the law, and I don't think she'll follow the law in that regard."

**{¶56}** The defense then requested a further opportunity to question the prospective juror.  The judge granted the request.  During this additional voir dire, defense counsel tried to explain the difference between proof beyond a reasonable doubt and proof beyond all doubt.  Counsel then asked the prospective juror whether she would use the reasonable-doubt standard if so instructed, and the prospective juror answered, "Yes."

**{¶57}** But when the prosecutor asked the prospective juror what "beyond a reasonable doubt" meant to her, she gave confused responses: "They have to prove to me all the evidence, everything that comes in, prove to me beyond a reasonable doubt." She went on to explain, "They have to prove to me. Make my mind up * * * with all of the evidence they have." The prosecutor asked, "With two eyewitnesses and a gun?" "Yes," said the prospective juror.

**{¶58}** "The proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, following *Wainwright v. Witt*, supra, 469 U.S. 412, 420, 105 S.Ct. 844, 83 L.Ed.2d 841.

**{¶59}** The trial judge here determined that the prospective juror did not understand the concept of "proof beyond a reasonable doubt" and would not follow the law in that regard. We must defer to that finding if the record supports it, see *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915, and, in this case, the record does. Prospective juror No. 389 said that she would hold the state to an extraordinarily high burden of proof in the guilt phase of a capital case, requiring the state to produce two eyewitnesses and the murder weapon before she would vote to convict. Her opinion persisted despite the best efforts of defense counsel to explain what the state's burden actually was. Because the record supports the trial judge's decision to grant the challenge for cause, we overrule Group's first and fourth propositions of law.

**{¶60}** In his third proposition of law, Group contends that the trial court should have granted his challenge for cause to prospective juror No. 383. He contends that the prospective juror indicated that if Group were found guilty, she would favor the death penalty under all circumstances and would not consider

10

mitigating factors. Group asserts that denying his challenge for cause violated his Sixth Amendment right to an impartial jury.

**{¶61}** The state contends that Group's Sixth Amendment claim is precluded because the challenged prospective juror was eliminated by a defense peremptory challenge and therefore did not sit on the jury. See *Ross v. Oklahoma* (1988), 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80. However, Ohio law recognizes that "where the defense exhausts its peremptory challenges before the full jury is seated, the erroneous denial of a challenge for cause in a criminal case may be prejudicial." *State v. Cornwell* (1999), 86 Ohio St.3d 560, 564, 715 N.E.2d 1144, citing *Hartnett v. State* (1885), 42 Ohio St. 568, 1885 WL 52, paragraph four of the syllabus. See, also, *State v. Tyler* (1990), 50 Ohio St.3d 24, 30-31, 553 N.E.2d 576; *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646. Group did exhaust his peremptory challenges in this case, and he used one of those challenges to eliminate prospective juror No. 383.[1] Thus, we examine the merits of his claim.

**{¶62}** "A juror whose views on capital punishment are such that they would prevent or substantially impair his ability to consider mitigating factors, as the law requires, is disqualified." *State v. Murphy* (2001), 91 Ohio St.3d 516, 526, 747 N.E.2d 765. Thus, "[a] capital defendant may challenge for cause any prospective juror who, regardless of evidence of aggravating and mitigating circumstances and in disregard to jury instructions, will automatically vote for the death penalty in every case." *State v. Stojetz* (1999), 84 Ohio St.3d 452, 456, 705 N.E.2d 329. See *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492.

---

1. Prospective juror No. 383 would have been an alternate juror, but that fact does not change the analysis. The record shows that, had she not been removed, juror 383 would have been the second alternate juror. The second alternate juror did in fact become a member of the jury in the penalty phase of this case because a member of the original jury and the first alternate juror were both excused after the guilt phase. So prospective juror No. 383 would have been a penalty-phase juror if Group had not expended a peremptory challenge on her.

{¶63} Prospective juror No. 383 wrote on her questionnaire, "I firmly believe in the death penalty." On voir dire, she stated that killers "should just be put to death." She also said, "I don't understand why somebody—you would give somebody [a lesser sentence than death] if they killed someone." In addition, when asked whether she could name anything that Group "could show that might be important to [her] to weigh against the possibility of death," the prospective juror answered, "I don't think so." According to Group, these responses "indicated that [the prospective juror] would probably not consider mitigation evidence even if it was presented."

{¶64} On the other hand, during her voir dire, prospective juror No. 383 did concede that "there are certain [murder] cases where" the death penalty would not be appropriate, and that "in some instances [30 years of imprisonment] would be a fair sentence." When defense counsel asked prospective juror No. 383 whether she would consider certain mitigating factors, she said she might consider them. For instance, she said she might consider evidence that Group had been a hard worker, that he had a mental disease, or that he grew up in a one-parent household. She also said that in considering a sentence less than death, she would want to know the reason the defendant committed the crime.

{¶65} The record supports a conclusion that prospective juror No. 383 was not an "automatic death penalty" prospective juror. When asked whether "every instance of murder * * * should merit the death penalty," she stated, "*I guess there are certain cases where it doesn't*, but if a person just shoots somebody or stabs somebody or just takes their life *for no reason*, yeah, they should be put to death." (Emphasis added.) When defense counsel explained the various life-sentence options, the prospective juror said, "I guess in some instances it would be a fair sentence that you could give."

{¶66} It is true that prospective juror No. 383 equivocated. However, where a prospective juror gives contradictory answers on voir dire, the trial judge

need not accept the last answer elicited by counsel as the prospective juror's definitive word. See *State v. White* (1999), 85 Ohio St.3d 433, 439, 709 N.E.2d 140, citing *State v. Scott* (1986), 26 Ohio St.3d 92, 97-98, 26 OBR 79, 497 N.E.2d 55. Rather, "it is for the trial court to determine which answer reflects the juror's true state of mind." *State v. Jones* (2001), 91 Ohio St.3d 335, 339, 744 N.E.2d 1163.

**{¶67}** We conclude that the prospective juror's responses to the questions posed do not necessarily indicate that if she were a member of the jury, she would refuse to listen to the mitigating evidence in violation of her instructions and oath. Nor do they indicate that she had irrevocably made up her mind to sentence Group to death in the event of his conviction. Taken as a whole, the record does not permit us to find that the trial judge abused her discretion when she overruled Group's challenge for cause. See *Wilson*, 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915, supra. We therefore overrule Group's third proposition of law.

**{¶68}** In his ninth proposition of law, Group contends that the trial judge abused her discretion by removing an alternate juror who did not agree with the jury's verdict of guilt on the aggravated murder charge.

**{¶69}** After the jury returned its verdicts, the trial court asked each of the four alternate jurors whether they could "accept" the verdicts rendered by the jury on the aggravated murder charge and its specifications. Each one said that he or she could.

**{¶70}** Before the penalty phase, a juror was dismissed and replaced with the first alternate juror. However, as soon as the alternate learned that she was to sit on the jury in the penalty phase, she advised the trial judge that she was "emotional and a little shook up" and that she wanted to address the court.

**{¶71}** In chambers, the former alternate—now designated juror No. 10—said that, while she felt that the evidence tended to show guilt, she was "bothered by a lot of things that the police didn't do." She stated, "[F]or a sentence as

serious as this, it's kind of bothersome to me, because I think he should have had the advantage of whatever investigating the — the police did and there just were too many things that weren't done." She further said, "I accept [the verdict], but with reservations." She admitted that she had a reasonable doubt of Group's guilt and would "[p]robably not" have voted to convict. Although she had previously told the court that she could accept the verdict, she later explained that she thought she "had no choice." The trial judge excused juror No. 10 and replaced her with the second alternate.

{¶72} Group contends that excusing this juror was "manifestly arbitrary," *Tyler*, 50 Ohio St.3d at 31, 553 N.E.2d 576, and therefore an abuse of discretion, because the juror's "reservations" as to the verdict did not indicate an inability to be impartial.

{¶73} We disagree. The trial court's decision was supported by the juror's persistent reservations as to the verdict. The jury's right to recommend a sentence is predicated on the jury's finding of the defendant's guilt beyond a reasonable doubt. It would be difficult for a juror who could not accept the jury's finding of guilt to consider the penalty with impartiality.

{¶74} We further note that the juror raised the issue with the court. The trial judge could reasonably interpret that fact as an indication that the juror doubted her own ability to serve in the penalty phase. Moreover, the juror appears to have felt strongly about the issue. Finally, her statement suggests that her reservations would in fact have affected her judgment as to the sentence: "[F]or a sentence as serious as this, * * * it's kind of bothersome to me * * * ." Group's ninth proposition of law is overruled.

II

Weight and Sufficiency of the Evidence

{¶75} In his fifth proposition of law, Group contends that his aggravated murder conviction was against the manifest weight of the evidence.

**{¶76}** A reviewing court may find a verdict to be against the manifest weight of the evidence even though legally sufficient evidence supports it. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. In a capital case where the crime was committed after January 1, 1995, this court can find a guilty verdict to be against the manifest weight of the evidence, pursuant to R.C. 2953.02. See, generally, *State v. Smith* (1997), 80 Ohio St.3d 89, 102-103, 684 N.E.2d 668.

**{¶77}** A reviewing court considering a manifest-weight claim "review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses." *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. The question for the reviewing court is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction." Id. See *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

**{¶78}** Group claims that the jury "lost its way" by finding that he was the person who killed Robert Lozier. We disagree.

**{¶79}** Sandra Lozier identified Group in court as the person who shot her and her husband. Her identification was definite and consistent. When she became conscious after the shooting, she tried to write the words "Ohio Wine" on the floor in her own blood. She told the 911 operator and Sergeant Martin that the assailant was the deliveryman for Ohio Wine. Later that day, in the hospital, she picked Group's picture from a photo array and identified him as the killer. Since she knew Group, her identification was reliable. See *State v. Waddy* (1992), 63 Ohio St.3d 424, 440, 588 N.E.2d 819; *State v. Campbell* (1994), 69 Ohio St.3d 38, 56, 630 N.E.2d 339.

**{¶80}** Moreover, the killer had asked to see invoices, and a box of Ohio Wine invoices was later discovered to be missing from the bar. This connects the crime with Group, because twice in the weeks preceding the murder Group had asked to look at the Loziers' copies of Ohio Wine invoices.

**{¶81}** Blood was found on one of the tennis shoes Group was wearing when he was arrested. When confronted with this fact, Group explained it by saying that he had cut his finger. But DNA analysis proved that Group could not have been the source of the blood. Moreover, the DNA analysis showed that the blood matched Robert Lozier's DNA. At trial, Group suggested that police had placed the blood on his shoe after his arrest, but no evidence supports that theory.

**{¶82}** Further evidence of Group's guilt was presented at trial regarding Group's actions while in prison awaiting trial. Group tried to enlist several others to falsify evidence and to eliminate or intimidate Mrs. Lozier. Such acts are highly probative of guilt. See *State v. Campbell*, supra, 69 Ohio St.3d at 47, 630 N.E.2d 339.

**{¶83}** Group lied to his friend Lisa Modarelli, telling her that he had been shooting with a friend the day before the murder. Later, he changed his story, telling her that he had been shooting with his foster son Bill Enyeart. (Enyeart, a *defense* witness, testified that he and Group had not gone shooting; in fact, Enyeart had never seen Group with a gun.)

**{¶84}** Group asked Bonnie Donatelli to persuade Darryl Olenick to tell police that he and Group had been target shooting together the day before the murder. But Olenick testified that he and Group had never gone target shooting together.

**{¶85}** Group asked Adam Perry to firebomb Mrs. Lozier's house. He asked Perry to leave a key chain with the name Charity on it on Mrs. Lozier's lawn after starting the fire so that investigators would believe that there was a connection between the firebombing and Charity Agee's disappearance—a

significant fact, since the killer had told the Loziers that he was Agee's brother. Group also asked inmate Robert Clark to tell the police that he had been near the Downtown Bar on the morning of the shooting and that he had seen a man leaving the bar that did not match Group's description. The testimonies of Perry and Clark on these points were corroborated by Group's letters to those inmates, letters that Group admitted writing.

{¶86} The evidence implicating Group in Robert Lozier's murder is overwhelmingly persuasive: DNA evidence, eyewitness testimony from a victim who knew Group, and Group's efforts to create false evidence and intimidate Mrs. Lozier. Even though several members of Group's family and a close family friend testified in support of Group's alibi, this is not "the exceptional case in which the evidence weighs heavily against the conviction." *Martin*, supra, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717. This case is therefore not a candidate for reversal on weight-of-the-evidence grounds.

{¶87} Group further contends that the jury's finding that he committed aggravated robbery was against the weight of the evidence. Group's contention is without merit.

{¶88} Sandra Lozier testified that on the morning of the murder, she had taken five bags of cash from the safe and had put them on her desk. She further testified that when she regained consciousness after being shot, she looked at the desk and saw that the money bags were gone. The 911 tape corroborates this testimony, as it captured Mrs. Lozier telling the operator that the killer had robbed the bar.

{¶89} Sergeant Datko, the first officer to arrive on the scene, did not recall seeing money on either of the desks. Moreover, Group had quit his job a day before the murder. His unemployment gave him a motive for robbery, and he had no other discernible motive for shooting the Loziers. Thus, it cannot be said

that the jury lost its way in finding that Group committed aggravated robbery. Accordingly, Group's fifth proposition of law is overruled.

{¶90} In his seventh proposition, Group contends that the state introduced insufficient evidence to prove him guilty of attempted aggravated murder. When a defendant challenges the legal sufficiency of the state's evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶91} The state's evidence showed that Group had asked Adam Perry to firebomb Mrs. Lozier's house. In exchange, Group said he would give Perry $150,000 and would dissuade a witness from testifying in Perry's trial. Group gave Perry Mrs. Lozier's address, gave him instructions for making a firebomb, and instructed him to drop a key chain with the name "Charity" on it.

{¶92} However, Perry took no further action in furtherance of the plan against Mrs. Lozier after knocking on her door and finding that she was still living in her house. Perry testified that he had no intention of killing Mrs. Lozier and that Group had assured him that the house was vacant.

{¶93} Group argues that "based upon [Perry's] testimony there is absolutely no evidence of an attempted aggravated murder of Sandra Lozier at the time of this incident." The state contends that Group's actions in this case—repeatedly asking Perry to firebomb the house, giving him the address and the firebomb recipe, offering to reward him, instructing him to leave a false trail—were enough to permit the jury to find him guilty of attempted aggravated murder.

{¶94} The crime of attempt is defined by R.C. 2923.02(A), which provides: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

**{¶95}** We have elaborated on the statutory definition as follows: "A 'criminal attempt' is when one purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." *State v. Woods* (1976), 48 Ohio St.2d 127, 2 O.O.3d 289, 357 N.E.2d 1059, paragraph one of the syllabus. A "substantial step" requires conduct that is "strongly corroborative of the actor's criminal purpose." Id. "[T]his standard does properly direct attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention * * * in order to prevent the crime when the criminal intent becomes apparent." *Id.* at 132, 2 O.O.3d 289, 357 N.E.2d 1059.

**{¶96}** Two Ohio courts have concluded that merely soliciting another person to commit a crime does not constitute an attempt. See *State v. Dapice* (1989), 57 Ohio App.3d 99, 104, 566 N.E.2d 1261 ("mere preparation" does not itself constitute an attempt); *State v. Valenta* (June 28, 2001), Cuyahoga App. No. 78232, 2001 WL 723247. That also appears to be the majority view nationally.[2]

**{¶97}** However, Group did more than merely solicit the firebombing of Mrs. Lozier's house. He took all action within his power, considering his incarceration, to ensure that the crime would be committed. He offered Perry a large monetary reward and a reciprocal favor. He gave Perry Mrs. Lozier's address and told him how to make the bomb. He repeatedly wrote to Perry urging him to complete the act.

**{¶98}** Some courts have found the elements of a criminal attempt in cases factually similar to the case at bar. In *State v. Urcinoli* (1999), 321 N.J.Super. 519, 729 A.2d 507, the defendant hired a fellow inmate to kill someone outside

---

2 For a survey of precedents, see *State v. Otto* (1981), 102 Idaho 250, 252-255, 629 P.2d 646; *State v. Kilgus* (1986), 128 N.H. 577, 583-584, 519 A.2d 231; *State v. Sunzar* (1999), 331 N.J.Super. 248, 252-254, 751 A.2d 627.

the jail. The defendant expected the other inmate to be released soon; he and the other inmate discussed how the plan would be carried out and how the other inmate would be paid for the murder; and the defendant gave the other inmate identifying details about the intended victim. These discussions were held to be a substantial step, sufficient for an attempted-murder conviction. Id. at 537, 729 A.2d 507.

{¶99} The court reached a similar conclusion in *Braham v. State* (Alaska 1977), 571 P.2d 631. The defendant in Braham hired someone to kill a third person. After the defendant and his hired killer agreed on the contract price, the defendant instructed the killer to visit the victim in order to get close to him and gain his trust in preparation for his murder. The hired killer did, in fact, visit the victim. After doing so, the killer abandoned the scheme and cooperated with police. On these facts, the court held the evidence sufficient to support a conviction of attempted murder. 571 P.2d at 637-638. But, cf., *State v. Molasky* (Mo.1989), 765 S.W.2d 597, 600-602.

{¶100} "The federal courts have generally rejected a rigid or formalistic approach to the attempt offense. Instead they commonly recognize that '[t]he determination whether particular conduct constitutes * * * [an attempt] is so dependent on the particular facts of each case that, of necessity, there can be no litmus test to guide the reviewing courts.' * * * Following this analysis, which we consider the better reasoned approach, several federal courts have concluded that a solicitation accompanied by the requisite intent may constitute an attempt." *United States v. Am. Airlines, Inc.* (C.A.5, 1984), 743 F.2d 1114, 1121, quoting *United States v. Ivic* (C.A.2, 1983), 700 F.2d 51, 66.

{¶101} We agree with the federal courts that "a rigid or formalistic approach to the attempt offense" should be avoided. Nothing in the language of R.C. 2923.02(A), or in our own precedents, compels such an approach. R.C. 2923.02(A) defines attempt broadly as "conduct that, if successful, would

constitute or result in the offense." In *State v. Woods*, supra, 48 Ohio St.2d 127, 2 O.O.3d 289, 357 N.E.2d 1059, paragraph one of the syllabus, we defined a "criminal attempt" as "an act or omission constituting a substantial step in a course of conduct planned to culminate in [the actor's] commission of the crime." A "substantial step" requires conduct that is "strongly corroborative of the actor's criminal purpose." Id.

{¶102} With reference to "overt acts," we said in *Woods* that the "substantial step" standard "properly direct[s] attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention * * * in order to prevent the crime when the criminal intent becomes apparent." Id. at 132, 2 O.O.3d 289, 357 N.E.2d 1059. Thus, we conclude that an "overt act" is simply an act that meets the "substantial step" criterion enunciated in *Woods*.

{¶103} Group's acts—offering Perry $150,000 to throw a firebomb through the window of Mrs. Lozier's house, providing him with her address, repeatedly importuning him to commit the crime, and instructing him how to make the bomb and how to misdirect any subsequent police investigation—strongly corroborate Group's criminal purpose, and therefore constitute a substantial step in a course of conduct planned to culminate in the aggravated murder of Mrs. Lozier. We therefore find that the evidence presented was sufficient to prove the essential elements of attempted aggravated murder.

{¶104} Group's seventh proposition of law also contends that the state failed to prove him guilty of intimidation, which is defined in R.C. 2921.03(A). We disagree.

{¶105} The state presented the following evidence to support this charge: Group hired Perry to firebomb Mrs. Lozier's house so that she would not testify against him. In June 1998, Perry knocked on Mrs. Lozier's door and asked her whether a "Maria something lived there." When Mrs. Lozier said no, Perry

thanked her and left. Mrs. Lozier saw Perry looking around at the neighboring houses, which gave her a "little bit of a scare." She watched Perry drive away and noted that he did not stop at any nearby houses. When she looked up the name Perry had given her, she found that no such person lived on her street. She described Perry's car to a neighbor and asked her to watch for it. Two days later, Sergeant Martin told Mrs. Lozier that someone had been hired to kill her. She told Martin about the incident with Perry, whereupon he advised her to move out of her house right away. She followed this advice.

{¶106} On these facts, the state presented sufficient evidence to permit the jury to find Group guilty of intimidation. R.C. 2921.03(A) provides: "No person, knowingly and by force [or] by unlawful threat of harm to any person or property, * * * shall attempt to influence, intimidate, or hinder a * * * witness in the discharge of the [witness's] duty."

{¶107} There is no question that Group intended to influence, intimidate, or hinder Mrs. Lozier in discharging her duties as a witness. Moreover, given Mrs. Lozier's reaction to Perry's visit, the jury could reasonably find that Perry's words and actions constituted a threat within the meaning of the statute. Group's seventh proposition of law is therefore overruled.

### III

### Instructions

{¶108} In his eighth proposition of law, Group contends that the trial court committed reversible error by declining to give the jury six of his proposed guilt-phase instructions. We have held that "it is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge." *State v. Scott* (1986), 26 Ohio St.3d 92, 101, 26 OBR 79, 497 N.E.2d 55. However, the trial court need not give the defendant's requested instructions verbatim but may use its own

language to communicate the same legal principles to the jury. See *State v. Sneed* (1992), 63 Ohio St.3d 3, 9, 584 N.E.2d 1160.

{¶109} Group's requested jury instruction No. 5 stated in part: "Evidence that may raise a suspicion, a possibility, or a probability of guilt is not enough to overcome the presumption of innocence or to justify a finding of guilty." The trial court did not give this instruction, but it did give standard instructions on the presumption of innocence and the state's burden to prove guilt beyond a reasonable doubt. The instructions also defined proof beyond a reasonable doubt as "proof of such character that an ordinary person would be willing to rely and act upon it in the most important of their own affairs." Thus, Group's instruction was covered by the general charge.

{¶110} The proposed instruction further stated: "Mr. Group must be found not guilty unless you are satisfied that the prosecutor produced evidence which convinces you beyond a reasonable doubt of every element of the offense charged." The trial court actually instructed: "The defendant must be acquitted unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offenses charged in the indictment." In this regard, we see no material difference between the proposed instruction and the instruction the trial court gave.

{¶111} Requested jury instruction No. 11 warned the jury not to "stack one inference upon another inference," i.e., not to draw one inference from another. The trial court did not give this instruction, but it did instruct the jury as follows:

{¶112} "Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow, according to the common experience of mankind.

**{¶113}** "To infer or make an inference is to reach a reasonable conclusion or deduction of fact which you may, but are not required to make, from other facts *which you find have been established by direct evidence.* Whether an inference is made rests entirely with you." (Emphasis added.)

**{¶114}** In *State v. Palmer* (1997), 80 Ohio St.3d 543, 560-562, 687 N.E.2d 685, where the trial court gave an instruction on inferences nearly identical to that given in this case, we rejected a claim that a specific warning against stacking inferences was also needed. The instruction at issue "did *not* permit the jury to make an inference based solely or entirely upon another inference," since the trial court had "specifically instructed the jury that inferences could be made only from *facts* the jury found to have been established by direct evidence." (Emphasis sic.) Id. at 561, 687 N.E.2d 685. We therefore hold that the trial court did not err by refusing to give requested jury instruction No. 11.

**{¶115}** Requested jury instruction No. 18 stated that police testimony "must be weighed by the same standards you apply to every other witness" and "should not be given any greater or lesser weight merely because they are police officers or detectives."

**{¶116}** The lower courts are divided as to whether a trial court should give a special instruction on police credibility. See *State v. Broadus* (1984), 14 Ohio App.3d 443, 445, 14 OBR 563, 472 N.E.2d 50 (defendant entitled to instruction); contra *State v. Griffin* (June 6, 1995), Franklin App. No. 94APA11-1623, 1995 WL 347769 (separate instruction on police officer credibility prohibited).

**{¶117}** The subject of witness credibility was covered in the general jury charge. The court instructed the jurors that they were the "sole judges of * * * the credibility of the witnesses and the weight of the evidence" and that they must consider "the witness' * * * interest and bias" in judging credibility. Where a trial court gives instructions such as these, which apply equally to *all* witnesses, there is no need for any special comment or instruction regarding police credibility.

*State v. Taylor* (Feb. 9, 1999), Medina App. No. 2783-M, 1999 WL 61619. See, also, *Bell v. Philadelphia* (1985), 341 Pa.Super. 534, 546, 491 A.2d 1386; *State v. McKenzie* (1996), 197 W.Va. 429, 442-444, 475 S.E.2d 521.

{¶118} Moreover, such a special instruction runs afoul of the principle we enunciated in cases such as *Curtis v. State* (1925), 113 Ohio St. 187, 209-210, 148 N.E. 834, and *State v. Scott*, supra, 26 Ohio St.3d at 101, 26 OBR 79, 497 N.E.2d 55, that a trial judge may not single out a particular witness or group of witnesses to discuss their credibility, since such discussion exerts an undue influence on the jury. Accord *McKenzie*, supra, 197 W.Va. at 444, 475 S.E.2d 521 (special instruction on police credibility "would have unduly highlighted" police testimony). We therefore hold that the trial judge did not err by failing to give requested jury instruction No. 18.

{¶119} Requested jury instruction No. 19 stated: "When certain witnesses testified, evidence of prior criminal convictions was introduced to attack the credibility of those witnesses. You may consider the prior criminal convictions of any witness when assessing that witness' credibility." Although this instruction was not covered by the general charge on witness credibility, we think that any error was harmless. A jury assessing the credibility of a witness is not likely to overlook the witness's record of prior convictions.

{¶120} Requested jury instruction No. 20 stated: "You are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or any part of the testimony of any witness." The trial court gave this instruction verbatim. Group's claim that the trial court refused to give it is simply incorrect.

{¶121} Requested jury instruction No. 21 states: "The prosecution has the burden of proving identity beyond a reasonable doubt. Identification testimony is an expression of belief or impression by the witness. Its value depends on the

opportunity the witness has to observe the offender at the time of the offense, to remember what was seen, and to make a reliable identification later."

{¶122} Requested jury instruction No. 22 adds: "You must be satisfied beyond a reasonable doubt of the accuracy of the identification of Mr. Group before you may convict him. If, after examining the testimony of the identifying witness, you are not convinced beyond a reasonable doubt that Mr. Group was the person who committed the crime, you must find him not guilty."

{¶123} The second sentence of requested jury instruction No. 22 was included in the trial court's instructions. The remaining portions of requested jury instructions Nos. 21 and 22 were covered by the general charge. The trial court instructed the jury that it must find beyond a reasonable doubt that Group was the offender. The trial court instructed the jury that in weighing the testimony of the identifying witness, it could consider, inter alia, "the opportunity of the [identifying] witness to observe" the offender.

{¶124} Requested jury instruction No. 23 dealt with factors the jury should consider in weighing identification testimony. However, the trial court gave an instruction on this subject, which in our view was adequate. It is true that the trial court's instruction omitted some factors mentioned in Group's proposed instruction, but it is also true that Group's proposed instruction omitted many factors mentioned in the trial court's instruction. No conceivable instruction could cover all of the factors relevant to weighing identification testimony. Since the trial court's instruction adequately covered the subject, the court did not err in rejecting the proposed instruction.

{¶125} Almost all of the instructions discussed in Group's eighth proposition were either given by the trial court or covered by the general charge. Finding no reversible error in the guilt-phase instructions, we overrule Group's eighth proposition of law.

{¶126} In his tenth proposition of law, Group contends that the trial court erred in the penalty phase by omitting certain requested jury instructions. Although it is not clear from Group's brief which proposed instructions he is alleging were left out, he seems to be referring to penalty phase requested jury instruction Nos. 22 and 27.

{¶127} Requested jury instruction No. 22 informed the jurors that they did not need to unanimously reject a death sentence before moving on to consider one of the life sentences. This point was adequately covered by the general charge. See, generally, *State v. Davis* (1996), 76 Ohio St.3d 107, 116-118, 666 N.E.2d 1099.

{¶128} Requested jury instruction No. 27 told the jury that the only guilt-phase evidence it could consider in the penalty phase was the evidence concerning the two aggravating circumstances: the attempted murder and the aggravated robbery. This, too, was covered by the general charge, which identified the aggravating circumstances and warned the jury that only those aggravating circumstances could be weighed against the mitigating factors. For the foregoing reasons, Group's tenth proposition of law is overruled.

{¶129} In his eleventh proposition of law, Group contends that R.C. 2929.04(B)(7) is "unconstitutionally vague" because it "may be understood by jurors as reasons for imposing the death sentence."

{¶130} R.C. 2929.04(B)(7) creates a "catchall" category of mitigation, requiring the sentencer to consider, and weigh against the aggravating circumstances, "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." Group contends that the language of R.C. 2929.04(B)(7) permits the sentencer to consider, without limitation, reasons why the death sentence *should* be imposed as well as reasons why it should not. Thus, Group contends, an instruction on the R.C. 2929.04(B)(7) mitigating factor

amounts to an unconstitutional invitation to consider nonstatutory aggravating circumstances.

{¶131} In *State v. Stallings* (2000), 89 Ohio St.3d 280 297- 298, 731 N.E.2d 159, we rejected the argument Group makes here. Besides, the trial court did not use the language in R.C. 2929.04(B)(7) to instruct the jury. The trial court instructed the jury, "[Y]ou will consider all of the evidence which is relevant to any mitigating factors." The court explained, "Mitigating factors * * * are those factors which do not constitute a justification or an excuse for the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree o[f] moral culpability or blame." The court then instructed the jury that the jury must find that the state proved beyond a reasonable doubt that an aggravating circumstance outweighed the mitigating factors before the jury could recommend a death sentence. Nothing in these instructions could be construed as an invitation to consider nonstatutory aggravating circumstances. Group's eleventh proposition is overruled.

IV

Ineffective Assistance of Counsel

{¶132} In his sixth proposition, Group claims that his counsel failed to render effective assistance. Ineffective-assistance claims are governed by a two-part test. To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., that, in light of all the circumstances, counsel fell below an objective standard of reasonable representation, and (2) resulting prejudice, i.e., a reasonable probability that, but for counsel's unprofessional errors, the proceeding's result would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the result of the proceeding. *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 690-691, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Williams v. Taylor* (2000), 529 U.S. 362, 390-391, 120 S.Ct. 1495, 146 L.Ed.2d 389; *State v. Bradley* (1989),

42 Ohio St.3d 136, 142-143, 538 N.E.2d 373, paragraph two and three of the syllabus.

{¶133} Group lists five alleged errors by counsel. First, he claims that counsel were ineffective because they did not make a timely request for a jury view of the crime scene. As a result, when they did request one, the request was denied.

{¶134} However, the record does not show that Group was prejudiced by the jury's not viewing the crime scene. Because Group's defense was that he was not at the crime scene on the day of the murder, the bathroom's dimensions were of little importance. Moreover, defense counsel's belief that the jury should see the dimensions of the office and bathroom was based in part on a misapprehension. Counsel mistakenly thought that the deputy coroner had testified that Robert Lozier was shot from "up to five feet" away. The deputy coroner had actually testified that he "couldn't tell how far away the weapon was because there was no mark on the body."

{¶135} Second, Group claims that defense counsel did not call expert witnesses "in regard to the Ballistic DNA." Since Group does not explain what he means by "ballistic DNA," we cannot evaluate this claim.

{¶136} Group further contends that counsel did not employ "a scientific investigation unit" to show that Group did not fire a gun on January 18, 1997. But Group fails to show either prejudice or deficient performance. As to prejudice, there is no way for us to tell whether the results of such testing would have helped Group's case. As to performance, counsel's performance cannot be characterized as deficient, because the record indicates that no valid test was possible.

{¶137} Officer Lou Ciavarella testified that he performed a gunshot residue test on Group's hands on the afternoon of January 18, 1997. However, Ciavarella's test took place at 3:25 p.m., more than four hours after the shooting.

According to Ciavarella's unchallenged testimony, the Bureau of Criminal Identification and Investigation recommends that any gunshot residue test be done within two hours after a gun is fired because the residue tends to rub off a person's hands over time. Thus, a negative test would have been devoid of probative value.

{¶138} Third, Group contends that counsel should have questioned prospective jurors on voir dire about their racial attitudes, because some letters written by Group that were admitted into evidence contain racial slurs, which might have prejudiced the jury against him.

{¶139} However, it is for counsel to determine what questions should be asked on voir dire. *Bradley*, supra, 42 Ohio St.3d at 143-144, 538 N.E.2d 373. Since Group and his victims were of the same race, counsel may have reasonably concluded that race was not an important factor in this case. Moreover, given the overwhelming evidence of Group's guilt, counsel's failure to inquire into jurors' racial attitudes was not prejudicial.

{¶140} Fourth, Group contends that defense counsel never had independent tests performed on the DNA evidence.

{¶141} The record indicates that Cellmark Diagnostics performed DNA testing for the prosecution in this case. The defense was allotted funds for its own DNA testing and submitted DNA samples to Lifecodes Corporation. Before trial, one of the prosecutors advised the trial court that, due to an acquisition, Cellmark and Lifecodes were now part of the same corporation. However, the defense counsel representing Group at that time had no objection to using Lifecodes; they were satisfied that the two testing facilities were independent of each other.

{¶142} At trial, Group had counsel different from those representing him on appeal. Trial counsel represented to the court that Dr. Baird, the Lifecodes expert, had read the Cellmark report and that his "cursory * * * evaluation" was that contamination may have taken place so as to render DNA testing "useless."

(Baird did not test the blood sample because Cellmark's testing had used it up.) According to defense counsel, Baird subsequently refused to testify, because "they are both in the same company, and * * * he did not want to challenge a coworker." Counsel tried to enlist Roche Laboratories, but Roche refused to get involved in the case at such a late date.

{¶143} The record does not show either deficient performance or prejudice. Group's original counsel apparently satisfied themselves that Cellmark and Lifecodes were independent. That situation did not change until later, when the DNA expert from Lifecodes backed out. When that happened, defense counsel tried to line up a replacement. Nothing in the record indicates that Group's counsel were at fault.

{¶144} As to prejudice, no one can say how a DNA expert from a different laboratory would have testified. Moreover, defense counsel cross-examined the Cellmark expert on the subject of contamination.

{¶145} Group also suggests that his counsel did not prepare adequately before cross-examining the state's DNA expert witness. However, the record indicates that defense counsel researched the subject of DNA thoroughly before cross-examining the Cellmark expert. Group does not identify any mistakes made by defense counsel as a result of allegedly inadequate preparation.

{¶146} Finally, Group contends that defense counsel subpoenaed certain witnesses and then failed to present their testimony. The record does show that subpoenas were served on some persons who were not called as witnesses. However, the record does not show what these persons would have testified about had they been called. Hence, Group cannot show that he was prejudiced by his counsel's failure to call them.

{¶147} Group's sixth proposition of law is overruled.

V

Settled Issues

{¶148} We summarily overrule Group's second proposition of law on authority of *State v. Reynolds* (1998), 80 Ohio St.3d 670, 675, 687 N.E.2d 1358, and *State v. Evans* (1992), 63 Ohio St.3d 231, 249, 586 N.E.2d 1042; his twelfth on authority of *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604; and his fourteenth, fifteenth, and sixteenth on authority of *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383; *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237. See, generally, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Spisak* (1988), 36 Ohio St.3d 80, 82, 521 N.E.2d 800.

VI

Independent Sentence Review

{¶149} In his thirteenth proposition of law, Group claims that his death sentence is inappropriate and that it is disproportionate to the penalty imposed in similar cases.

{¶150} Under R.C. 2929.05, we are required to independently review the death sentence. We must determine whether the evidence supports the jury's finding of each aggravating circumstance, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to those affirmed in similar cases.

{¶151} Group was convicted of two aggravating circumstances: committing aggravated murder as part of a course of conduct involving a purposeful attempt to kill two persons, R.C. 2929.04(A)(5), and committing aggravated murder during an aggravated robbery, R.C. 2929.04(A)(7). The evidence supports both aggravating circumstances. As to the course-of-conduct circumstance, sufficient evidence establishes that Group's purpose was to kill

32

both of his victims. Group shot Mr. Lozier in the head and Mrs. Lozier in the head and neck. The use of an inherently dangerous instrumentality in a robbery, coupled with the infliction of wounds in a vital area of the body, is sufficient to show purpose to kill. See, e.g., *State v. Clark* (1988), 38 Ohio St.3d 252, 256, 527 N.E.2d 844. Moreover, the evidence shows that the killing and attempted killing were part of a single course of conduct.

{¶152} There is also sufficient evidence to support the jury's finding that Group committed aggravated robbery. Indeed, as we conclude in discussing Group's fifth proposition of law, the evidence is strong enough to survive manifest-weight review.

{¶153} Against each of these aggravating circumstances, we must weigh the mitigating factors in the record. Group did not introduce evidence of the specific statutory mitigating factors in R.C. 2929.04(B)(1) through (B)(6). His claimed mitigating factors were his traumatic childhood, the mental disorder caused by those childhood traumas, and his good qualities as a person.

{¶154} Scott Group is the son of Kenneth Group Sr. and Ruth Group. Dr. Julia Hawgood, a clinical psychiatrist, testified about her findings with regard to Group's childhood.

{¶155} According to Dr. Hawgood, Group was an abused and neglected child. When Group was a toddler, his father "abandoned" him. Group's mother raised him but was abusive. Group was subjected to "beatings, burnings, demeaning critical name calling, rejection, rage attacks that seemed to come out of nowhere," forced isolation from his siblings, and "very harsh and often noncontingent punishment" (i.e., punishment for no reason). Group thus received "too little attention and nurturing and positive reinforcement during his early developmental years."

{¶156} Dr. Hawgood interviewed Group for a total of 9 to 11 hours. She testified that Group gave her the factual information on which she based her account of his childhood.

{¶157} Group testified that when he was young, his father came to visit him only "a couple times a year." His sister Theresa confirmed that. She also recalled that Group once jumped from a second story window because Mrs. Group had threatened to send him to live with his father.

{¶158} On the other hand, Group's father, Kenneth Group Sr., testified that he divorced Group's mother when Group was four. Kenneth Group testified that he saw Group once or twice a month until Group was in his teens. Kenneth Group eventually moved to Pennsylvania. Kenneth testified that Group went on camping trips with his mother and brother in Pennsylvania for three summers in a row and that Kenneth stayed with them almost every weekend during those trips.

{¶159} According to Kenneth Group, Group's mother used to summon him to Ohio to help discipline Group when he misbehaved. On those occasions, Kenneth Group would spank his son with a belt or paddle. Since Kenneth Group could come to Ohio only when he did not have to work, these punishments were sometimes inflicted as much as two weeks after the offense.

{¶160} Group's mother, Ruth Group, testified that she was violent toward her children and "would fly off the handle over the smallest thing." On one occasion, when Group's fourth grade teacher complained to Group's mother that he was misbehaving, Ruth humiliated Group by bringing a baby bottle to his school and placing it on his desk and telling him that if he wanted to act like a baby, she would treat him like one. Group's sister Theresa testified that Ruth once burned Group with a hot iron.

{¶161} However, Group testified that his mother never beat him or burned him, and he denied telling Dr. Hawgood that his mother had done these things. Group's father, Kenneth Group Sr., testified that he had never seen Group's

mother abuse him. Nor had he ever heard, from Group or anyone else, that she had abused him. Kenneth Group testified that he never saw any identifiable burn marks on Group. Once, when Group was 14 or 15, Kenneth did see some kind of marks on Group, but he did not know whether they were burn marks. When he asked Group about them, Group said that he got them while "scuffling." Ruth Group testified that, while some people thought she was too strict, others thought she was too lenient.

{¶162} Although Dr. Hawgood did not say that Group had a "mental illness," she diagnosed him as having a "borderline personality disorder." The disorder is characterized by "intense and unstable interpersonal relationships," "a tendency towards impulsivity, including self-damaging acts," "frequent suicidal ideations or intent," a "dichotomy between attachment and attacking," and a "fragile," "changing sense of self."

{¶163} In Hawgood's opinion, Group's early traumas instilled low self-esteem and a belief that "people are punishing, are rejecting, [and would] betray" him. As a result, Group's relationships with others were "intense" yet "unstable": intense because Group hoped that "at long last he could feel understood, * * * validated, * * * important"; unstable because Group, anticipating rejection and betrayal, readily shifted from intense attachment to "battle" mode.

{¶164} Hawgood believed that this "psychological dilemma," which "drove [Group] to one extreme or the other," caused him to behave in impulsive and often self-destructive ways. For instance, Group once was going to commit suicide by jumping from a bridge, but his friend stopped him.

{¶165} Dr. Hawgood testified that Group's impulsiveness reduced his ability to see how his behavior might affect himself or others. In this way, one could reason that Group's childhood traumas, because they rendered him more impulsive than an average person, played some role in the murder and thus deserve significant weight.

{¶166} However, we disagree with that line of reasoning. Nothing in the record indicates that this was an impulsive crime. To the contrary, Group's actions indicate considerable forethought. He went to the Downtown Bar warmly dressed; because this was unusual for Group, it can be seen as an attempt to disguise his identity or to hide a gun. After drawing his gun, he told the Loziers he was "the brother of the girl that was missing," another attempt to avoid identification. He forced the Loziers into the bathroom and shot them from behind, firing at least three times. Given these facts, it appears to us that impulsiveness had nothing to do with the murder. Hence, Group's traumatic childhood deserves little weight in mitigation.

{¶167} Group also introduced testimony from family members as to his redeeming personal qualities. His grandmother testified that he was kind and affectionate. Group's sisters, Danielle and Theresa, testified that he had been their best friend. He had talked to Danielle about her problems, picked her up when she ran away from home in her teens, and visited her in the hospital after the birth of her son. He tried to teach Theresa how to drive a car with a manual transmission. He got a job at age 16 or 17 and worked double shifts to buy Theresa's school clothes.

{¶168} Brenda and William Enyeart, ages 19 and 18 respectively, are the children of Group's former girlfriend. They lived with Group for about 15 years. After their mother broke up with Group, she neglected them, so they went to live with Group. He eventually got legal custody.

{¶169} Bill and Brenda testified that they considered Group to be their father and thought him a good one. He protected them, supervised their education, took care of them in sickness, and gave them abundant love and attention. In Brenda's opinion, he was a hard worker; Bill testified that Group was a good worker and that Group encouraged him to work. Group testified that the children meant "everything in the world" to him.

**{¶170}** During the guilt phase, one of Group's coworkers from Ohio Wine testified that Group had been a good worker who took on extra assignments even though he did not have to.

**{¶171}** Group's history as a hard-working family man who has earned the love of those closest to him clearly deserves weight. See *State v. Mitts* (1998), 81 Ohio St.3d 223, 236, 690 N.E.2d 522; *State v. Smith* (2000), 87 Ohio St.3d 424, 447, 721 N.E.2d 93; *State v. Treesh* (2001), 90 Ohio St.3d 460, 493, 739 N.E.2d 749.

**{¶172}** However, we have considered the mitigating factors in this case, and we have considered the aggravating circumstances. We conclude that the aggravating circumstances outweigh these mitigating factors beyond a reasonable doubt.

**{¶173}** We further find that the death sentence in this case is proportionate to sentences we have upheld in similar cases. We have affirmed death sentences in cases with course-of-conduct specifications where the defendant killed one victim and tried to kill a second. In one such case, the course-of-conduct specification was combined with an aggravated-robbery specification. See *State v. Dennis* (1997), 79 Ohio St.3d 421, 683 N.E.2d 1096. See, also, *State v. O'Neal* (2000), 87 Ohio St.3d 402, 721 N.E.2d 73 (course of conduct and aggravated burglary). Moreover, in *State v. Sowell* (1988), 39 Ohio St.3d 322, 530 N.E.2d 1294, we affirmed a death sentence with only a course-of-conduct specification. We have also affirmed a death sentence in a factually similar case with only an aggravated-robbery specification. See *State v. Hamblin* (1988), 37 Ohio St.3d 153, 524 N.E.2d 476.

**{¶174}** For the foregoing reasons, we affirm, in its entirety, the judgment of the Mahoning County Court of Common Pleas, including the sentence of death.

Judgment affirmed.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK, J., concurs in part and dissents in part.

_____

**COOK, J., concurring in part and dissenting in part.**

{¶175} I respectfully dissent from that aspect of the majority's judgment that affirms Group's conviction of intimidation in violation of R.C. 2921.03(A) because the evidence on that count was insufficient. I concur, however, in the balance of the majority opinion and judgment.

_____

APPENDIX

{¶176} Proposition of Law No. I: Appellant's due process rights protected by Amendment 14, United States Constitution are violated when the trial court dismisses for cause jurors who express views against capital punishment.

{¶177} Proposition of Law No. II: It is error for the trial court to overrule defendant's motion to prohibit the use of peremptory challenges to exclude jurors who express concerns about capital punishment, in violation of defendant's Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶178} Proposition of Law No. III: A trial court's refusal to excuse a juror who expressed a preference for the death penalty, and the inability to consider mitigation evidence and the corresponding requirements placed upon a capital defendant to excuse such a juror through the use of peremptory challenges, amounts to a denial of a fair and impartial jury and results in a denial of due process and equal protection of the laws under U.S. Const. Amend. XIV and Ohio Const. Art. [I], Sec. 2 and 16.

{¶179} Proposition of Law No. IV: The trial court's granting of the state's motion to excuse prospective juror number 389 for cause where the juror appears to be impartial and agrees to follow the judge's instructions, constituted a denial of a fair and impartial jury which resulted in the denial of due process and the

equal protection of the laws of the U.S. Const., Amend. IV in the Ohio Constitution Art. [I], Section[s] 2 and 16.

{¶180} Proposition of Law No. V: The conviction of the appellant for the charge of aggravated murder in this case is against the manifest weight of the evidence. The evidence was insufficient as a matter of law to support appellant's conviction for aggravated murder and should be reversed.

{¶181} Proposition of Law No. VI: The appellant's right to effective assistance of counsel is prejudiced by counsel's deficient performance.

{¶182} Proposition of Law No. VII: It is an abuse of discretion for the trial court to deny appellant's Rule 29 motion for acquittal regarding the attempted aggravated murder charge.

{¶183} Proposition of Law No. VIII: It is error for the trial court to fail to instruct the jury pursuant to the request of appellant on law pertinent to the case all in violation of appellant's rights as guaranteed in the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶184} Proposition of Law No. IX: It is prejudicial error for the trial court to remove a juror for expressing reservations to the verdict.

{¶185} Proposition of Law No. X: The trial court commits prejudicial error in failing to instruct the jury as requested by the appellant in the second phase of this trial in violation of the appellant's Fifth, Sixth, Eighth and Fourteenth Amendment rights to the United States Constitution.

{¶186} Proposition of Law No. XI: R.C. 2929.04(B)(7) is unconstitutionally vague and may be understood by jurors as reasons for imposing the death sentence.

{¶187} Proposition of Law No. XII: The Due Process Clause is violated by a jury charge which permits a criminal conviction on proof less than beyond a reasonable doubt.

{¶188} Proposition of Law No. XIII: It is prejudicial error to sentence defendant to the death penalty, when, based upon the law and the record of this case, the sentence of death herein is inappropriate and is disproportionate to the penalty imposed in similar cases, in violation of defendant's rights as guaranteed to him by the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Sections 5, 9, 10, and 16 of Article [I] of the Ohio Constitution.

{¶189} Proposition of Law No. XIV: R.C. 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 as read together and as applied in this case violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16 of Article [I] of the Ohio Constitution.

{¶190} Proposition of Law No. XV: The proportionality review that this court must conduct in the present capital case pursuant to Ohio Revised Code Section 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 5 and 10, Article [I] of the Ohio Constitution, and Ohio Revised Code 2929.05, in violation of defendant's rights as guaranteed to him by the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Sections 5, 9, 10 and 16 of Article [I] of the Ohio Constitution.

{¶191} Proposition of Law No. XVI: It is error for a trial court to impose a death sentence when the death penalty law as currently applied in Ohio violates R.C. 2929.05(A) by requiring appellate courts and the Supreme Court, in conducting their R.C. 2929.04(A) review of "similar cases" for proportionality, to examine only those cases in which a death sentence was imposed and ignore those in which a sentence of life with parole eligibility after twenty full years or life with a parole eligibility after thirty full years was imposed. The current method also violates the rights to a fair trial and due process, results in cruel and unusual punishment, and implicates others of appellant's protected rights as well, all as set

forth in the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and in Sections 1, 2, 5, 9, 10, 16 and 20, Article I of the Ohio Constitution.

_____

Paul J. Gains, Mahoning County Prosecuting Attorney, Janice T. O'Halloran and Dawn M. Durkin, Assistant Prosecuting Attorneys, for appellee.

Annette L. Powers and John P. Laczko, for appellant.

_____