JOURNAL ENTRY AND OPINION.
{¶ 1} Defendant-appellant Loren D. Young ("Young"), d.o.b. April 25, 1972, appeals from his jury trial conviction of one count of robbery in violation of R.C. 2911.02(A)(3), a felony of the third degree.[1]
For the reasons adduced below, we affirm.
 {¶ 2} A review of the record on appeal indicates that the trial commenced on January 9, 2002. The state presented the testimony of four witnesses.
 {¶ 3} The first witness for the state was the victim, Mary Jo Hays ("Hays"). Her testimony indicated that in October of 1999 she had acquired a Chow puppy from her sister's dog after that canine had given birth to a litter. She named the puppy "Simone."
 {¶ 4} In January of 2000, Hays met Young, and the two began dating. At the end of January, the two, with Simone, moved into an apartment together. Hays stated that she was the primary care giver of the dog and that she licensed the dog with Cuyahoga County. See State Exhibit 1 (a copy of a February 8, 2000 Cuyahoga County dog license application for Simone, filled out and signed by Hays). To the best of her knowledge, Young never licensed, fed, or bought toys for the dog, but he did help a little bit in training the dog and did help clean up messes created by the dog.
 {¶ 5} Hays testified that she and Young ended their relationship after a total of approximately ten months when she left him in November of 2000, not returning to the apartment or for the dog after leaving for work one Saturday. Hays claimed that she was afraid to return to the apartment.
 {¶ 6} Hays, who had moved in with her sister, went back to the apartment approximately two to three weeks later to collect her belongings. Hays claimed that almost everything in the apartment, including the furnishings, was hers except for Young's musical equipment and a radio. On that visit Hays was able to retrieve a bag-and-a-half of her clothing. Young told Hays at that visit that the dog had run away.
 {¶ 7} Hays was upset with the news about her dog and proceeded to search for Simone at dog pounds in the area, by driving through the neighborhood looking for the dog, and posting circulars in public places in the area. This searching continued for approximately two months without success.
 {¶ 8} Some time later, Hays heard from her sister's mother-in-law, Hazel Haney, that the dog was at her former apartment and that Young had abandoned the dog. Hays went to the apartment in late May or early June of 2001, was let inside the apartment by the landlord, and retrieved her dog, who was found inside the unit. Young was not at the apartment.
 {¶ 9} Approximately one month after retrieving her dog, sometime in the third week of June 2001, Hays came home one night to find Young waiting in her car for her to arrive. She had not seen or heard from him since before she had retrieved the dog. Hays and Young talked to one another. The dog was now with Hays outside the home. The conversation grew heated. Hays, who was approximately five feet five inches tall and three-and-a-half months pregnant with her first child, stood up and attempted to put the dog behind her so as to prevent Young, who was approximately six feet five inches tall and 210 pounds, from getting the dog. Young then pushed Hays backward and down to the ground, took the dog without Hays' consent, and proceeded down the street on foot. The police were then called.
 {¶ 10} Hays met the police outside the location where Young was living at the time and told them what had happened. The police then went inside the apartment and came out with the dog.
 {¶ 11} On cross and redirect examination, Hays admitted that in her statement to the police she had seen Young walking a dog after she had broken up with him before she had retrieved the dog. She was unsure, however, until being told by Ms. Haney that Young had the dog, that the dog Young had been seen with was Simone. Further, on cross she admitted that Young loved Simone, cared about what happened to the dog, and took care of the dog by occasionally walking and feeding it. She denied ever telling Young that he could keep the dog.
 {¶ 12} The second witness for the state was the victim's sister, Jamie Haney, who generally corroborated the testimony of the victim. In particular, Haney testified that she gave the puppy, Simone, to the victim shortly after its birth. Haney also testified that she observed the altercation in which Young pushed the victim to the ground and left with the dog and that she called the police. Between the time the victim retrieved her dog from Young's apartment to the time Young physically took the dog from the victim, a period of approximately six weeks, Haney had no knowledge of Young attempting to obtain the dog.
 {¶ 13} The third witness for the state was Cleveland Police Officer John Cho, who testified that he was dispatched on June 22, 2001, at approximately 11:30 p.m., to investigate the robbery involving the dog. Officer Cho met the victim at Young's residence, interviewed the victim, who claimed that the dog was hers and that it had been taken from her by Young without her consent, and then spoke with Young. Both Young and the victim claimed ownership of the dog. The officer went back to the victim and asked for proof of ownership. The victim still claimed ownership, but provided no documentation at that time. The officer then returned to Young's residence to seek proof of ownership. Upon reaching the door to Young's apartment, the officer found the door locked. The officer knocked but received no response. The officer then asked the landlord, Ms. Johnson, if she had keys to the apartment, which was above a closed bar. The landlord searched for keys but could not find the right one. The officer next asked the landlord for permission to use force to enter the apartment. The landlord gave permission for force to be used. The officer then kicked open the door, found the dog inside, but Young was not there. The officer then returned the dog to the victim, who was outside. The dog, who ran to the victim and wagged its tail, and the victim, who immediately began playing with the dog, appeared to be very happy and excited to be reunited. A subsequent search of a five-house radius from Young's apartment failed to locate him.
 {¶ 14} Responding to a second radio dispatch at approximately 4:20 a.m. on June 23, 2001, Officer Cho returned to the Young apartment area looking for Young and observed him walking up the driveway. Officer Cho and his partner apprehended Young and placed him under arrest.
 {¶ 15} The fourth witness for the state was Cleveland Police Detective Hugh Mills, who was assigned on June 25, 2001 to investigate the robbery involving the dog. From interviewing the victim, he obtained a dog license number for the dog. Using this license number, the detective obtained from the county auditor's office a copy of the original application for the license. See State Exhibit 1. This application was executed by the victim. Young's name appears nowhere on that application. The detective did not interview Young as part of the investigation. Finally, the detective presented the case to the city prosecutor's office, which made the decision to seek an indictment.
 {¶ 16} The state then rested its case. The court denied the admission of State Exhibit 1 into evidence. The defense made a motion for acquittal, arguing that the victim had abandoned ownership of the dog when she moved out of Young's apartment, leaving the dog in Young's possession, and that Young could not rob the victim of property he has an interest in. This motion for acquittal was overruled.
 {¶ 17} The defense then offered the testimony of three witnesses.
 {¶ 18} The first witness for the defense was Hazel Haney, who stated that she once helped Young move his residence to Francis Avenue, which move included, in part, a dog. Haney also testified that the victim had been given the dog when it was a puppy, that the victim moved in with Young after the victim had first received the puppy, and that Haney, not wishing to see the dog go to the pound because Young had left the dog home alone for several days, had told the victim, whom she considered the dog's owner, of the dog's location on the date the victim retrieved the dog from Young's apartment. Haney did observe Young in the neighborhood caring for the dog. Haney did not know whether Young had told the victim that the dog had run away and did not know of the victim's actions in searching for the dog. On cross-examination, Haney admitted that she had a receiving stolen property (felony) conviction and "probation violations," but on redirect examination insisted she would not lie to help Young.
 {¶ 19} The second witness for the defense was Bonita Johnson, who testified that she was the owner of the apartment on Francis Avenue, which Young moved to in April of 2001. The dog was with him when he moved there. Johnson corroborated the testimony of Haney with regard to the victim retrieving the dog from the apartment at the time the dog had been left alone by Young for several days. During this retrieval, Johnson asked the victim whether the victim was the owner of the dog, the victim replied affirmatively, and Johnson told the victim to take the dog. Johnson did not know who owned the dog prior to the move of April of 2001. In fact, on redirect-examination, Johnson stated that she did not "know who that stupid dog belonged to * * *."
 {¶ 20} The third witness for the defense was Sherri McCarty, who testified that she was the next-door neighbor of Young and the victim when they lived in an apartment building on West 74th Street in 2000. McCarty heard an argument in the hallway concerning, in part, the dog, when the victim had come back to the apartment to retrieve her belongings after having moved out. At the time of this confrontation between Young and the victim, the dog, according to McCarty, was inside the apartment. Young, according to McCarty, told the victim that she was not taking "my dog." The victim left without taking the dog. McCarty never saw the victim return to that apartment, but did testify that the dog ran away for approximately one week sometime after this confrontation. It was McCarty's opinion that Young loved the dog and cared for it, and that the victim and Young mutually agreed through this confrontation to leave the dog with Young. McCarty did not know whether Young had ever told the victim that the dog had run away or that the victim had searched for the supposedly missing dog. McCarty was also unaware that Young had left the dog home alone for several days, which precipitated the return of the victim to retrieve the dog with the help of the landlord.
 {¶ 21} The defense then rested its case and renewed its motion for acquittal. This motion was denied.
 {¶ 22} Following closing arguments and being instructed as to the law to be applied, the jury returned its guilty verdict on January 11, 2002.
 {¶ 23} The trial court sentenced Young on April 26, 2002 to one year imprisonment with credit for time served (233 days total credit) and court costs, and advised that post-release controls were applicable. On June 10, 2002, the trial court granted shock probation and judicially released Young from prison.
 {¶ 24} Appellant-Young presents three assignments of error for review.
 {¶ 25} The first assignment of error states: "Mr. Young Received Ineffective Assistance Of Counsel When His Trial Counsel Pursued An Invalid Legal Theory As The Appellant's Defense."
 {¶ 26} The standard of review with respect to a claim of ineffective assistance of trial counsel was recently stated in State v.Group (Dec. 30, 2002), 2002-Ohio-7247:
 {¶ 27} "Ineffective-assistance claims are governed by a two-part test. To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., that, in light of all the circumstances, counsel fell below an objective standard of reasonable representation, and (2) resulting prejudice, i.e., a reasonable probability that, but for counsel's unprofessional errors, the proceeding's result would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the result of the proceeding. Strickland v. Washington (1984), 466 U.S. 668, 687-688,690-691, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; Williams v. Taylor (2000),529 U.S. 362, 390-391, 120 S.Ct. 1495, 146 L.Ed.2d 389; State v. Bradley
(1989), 42 Ohio St.3d 136, 142-143, 538 N.E.2d 373, paragraph two and three of the syllabus."
 {¶ 28} In this assignment, appellant argues that trial counsel was ineffective in two respects. First, counsel was allegedly ineffective in pursuing the defense theory that Hays, the victim, was not the owner of the dog, but that Young was the owner. Appellant's argument is premised on his belief that proof of ownership in the dog was immaterial to demonstrating the theft offense. In support of this theory, appellant cites us to State v. Rhodes (1982), 2 Ohio St.3d 74, 442 N.E.2d 1299, for the proposition that "* * * title ownership in a specific person other than the defendant is not an element of a theft offense. The important question is not whether the person from whom the property was stolen was the actual owner, but rather whether the defendant had any lawful right to possession." Appellant's brief at 8, citing Rhodes, supra,2 Ohio St.3d at 76.
 {¶ 29} Appellant's interpretation of Rhodes is unduly narrow and misses the context of that case. In Rhodes, the defendant had stolen a car from a citizen. The question put to the Supreme Court of Ohio inRhodes was whether the state, in proving the theft offense, was required to prove ownership of the car by introducing into evidence the certificate of title for the car. In a unanimous opinion, the Rhodes
majority said "no," and held that a certificate of title was not required to demonstrate that one from whom the car was stolen was in lawful possession of the car. Instead, it is the defendant's lawful right to possession which is key for purposes of the theft offense and R.C.2913.01(D). As the Rhodes court stated, "it is merely necessary to prove that a defendant deprived someone of property who had `possession or control of, or any license or any interest in' that property. It is unnecessary, however, for one from whom possession or control is taken to have lawful possession or control." Rhodes, supra, 2 Ohio St.3d at 76.
 {¶ 30} In the present case, the defense strategy of attempting to demonstrate Young's lawful right to possess the dog due to the alleged abandonment of the dog by Hays when she moved out without taking the animal was an available method of demonstrating Young's lawful right to possess the dog. That this strategy could be viewed as concurrently refuting Hays' right to possession caused no prejudice to the defendant. Accordingly, defense counsel was not ineffective in pursuing this strategy.
 {¶ 31} Appellant's second argument concerning defense counsel's performance is that his trial counsel failed to explore a "possible factual defense" challenging "whether Mr. Young used or threatened the use of immediate force during the commission of the alleged offense." As recently stated in State v. Holder (Dec. 20, 2002), Geauga App. Nos. 2001-G-2345 and 2001-G-2350, 2002-Ohio-7124, at ¶ 59, 2002 Ohio App. LEXIS 6954:
 {¶ 32} "* * * debatable strategic and tactical decisions will not form the basis of a claim for ineffective assistance of counsel, even if there had been a better strategy available. State v. Phillips (1995),74 Ohio St.3d 72, 85, 656 N.E.2d 643. In other words, errors of judgment regarding tactical matters do not substantiate an appellant's claim of ineffective assistance of counsel."
 {¶ 33} The first assignment of error is overruled.
 {¶ 34} The second assignment of error states: "The Verdict Was Not Supported By Sufficient Evidence." Appellant's brief at 11.
 {¶ 35} As stated in Group, supra, 2002-Ohio-7247, at ¶ 90:
 {¶ 36} "When a defendant challenges the legal sufficiency of the state's evidence, `the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis sic.) Jackson v. Virginia (1979),443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560."
 {¶ 37} Viewing the evidence in a light most favorable to the state, we conclude that the evidence was legally sufficient to demonstrate the offense of robbery as charged in the indictment herein.
 {¶ 38} The second assignment of error is overruled.
 {¶ 39} The third assignment of error states: "Mr. Young's Conviction For Robbery Is Against The Manifest Weight Of The Evidence."
 {¶ 40} As stated in Group, supra, 2002-Ohio-7247, at ¶ 77:
 {¶ 41} "A reviewing court considering a manifest-weight claim `reviews the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses.' State v.Martin (1983), 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717. The question for the reviewing court is `whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.' Id. See Thompkins, 78 Ohio St.3d at 387,678 N.E.2d 541." See, also, State v. Thompkins (1997), 78 Ohio St.3d 380,678 N.E.2d 541.
 {¶ 42} In reviewing the evidence, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice so as to require a reversal of the conviction. Thus, this court will not substitute its judgment for that of the jury.
 {¶ 43} The third assignment of error is overruled.
Judgment affirmed.
ANNE L. KILBANE, P.J., and DIANE KARPINSKI, J., CONCUR.
[1] R.C. 2911.02(A)(3) provides:
"(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following: * * *; (3) Use or threaten the immediate use of force against another."
A "theft offense" is defined, in part, as including a violation of R.C. 2911.02 or 2913.02. See R.C. 2913.01(K)(1).
R.C. 2913.02(A), Theft, provides:
"(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
"(1) Without the consent of the owner or person authorized to give consent;
"(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
"(3) By deception;
"(4) By threat;
"(5) By intimidation."
R.C. 2913.01(D) defines "owner" as follows:
"(D) `Owner' means, unless the context requires a different meaning, any person, other than the actor, who is the owner of, who has possession or control of, or who has any license or interest in property or services, even though the ownership, possession, control, license, or interest is unlawful."