OPINION
{¶ 1} Defendant-appellant, Chamon L. Tribett, appeals from a judgment of the Franklin County Court of Common Pleas that convicted him of involuntary manslaughter and assault. For the following reasons, we affirm the judgment of the common pleas court.
 {¶ 2} By indictment filed on May 9, 2003, defendant was charged with one count of murder, one count of felonious assault, and one count of child endangering. According to the state, on or about April 23, 2003, defendant murdered Aalaysia Quander ("Aalaysia"), a child under 18 years old, as a proximate result of committing or attempting to commit felonious assault, child endangering, or both. The state further alleged that at the time that Aalaysia died, defendant had custody or control of her, and that defendant tortured or cruelly abused her.
 {¶ 3} By jury verdict, defendant was found guilty of lesser-included offenses of (1) involuntary manslaughter, a violation of R.C. 2903.04 and a felony of the third degree, and (2) assault, a violation of R.C. 2903.13 and a misdemeanor of the first degree. The jury found defendant not guilty of child endangering.
 {¶ 4} The common pleas court thereafter entered judgment and imposed a four-year prison sentence for the involuntary manslaughter conviction and a six-month sentence for the assault conviction. In its judgment, the court failed to specify whether the sentences should be served consecutively or concurrently, but the court did state that defendant would be granted time served for the assault conviction. The court also found that defendant had 444 days of jail-time credit.
 {¶ 5} From the common pleas court's judgment, defendant now appeals and raises three errors for our consideration:
ASSIGNMENT OF ERROR I
Appellant's convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, thereby violating Appellant's due process rights, under Section10, Article I of the Ohio Constitution and the Fifth andFourteenth Amendments to the United States Constitution.
ASSIGNMENT OF ERROR II
The trial court commits reversible error when it fails to state reasons on the record for giving more than the minimum sentence to an offender who has not previously served a prison term and for giving more than the minimum sentence when there were no facts proven beyond a reasonable doubt to the jury to support giving more than the minimum sentence.
ASSIGNMENT OF ERROR III
The trial court commits reversible error when it fails to state in its judgment entry that a misdemeanor sentence should be served concurrently with a felony sentence.
 {¶ 6} By his first assignment of error, appellant asserts that his convictions for involuntary manslaughter and assault are supported by insufficient evidence and are against the manifest weight of the evidence.
 {¶ 7} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether the factfinder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v.Thompkins (1997), 78 Ohio St.3d 380, 387, reconsideration denied, 79 Ohio St.3d 1451; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387; State v. Group, 98 Ohio St.3d 248,2002-Ohio-7247, at ¶ 77. As stated in Group:
The question for the reviewing court [in a manifest-weight claim] is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction."
Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. See, also, Thompkins, at 387.
 {¶ 8} Comparatively, when an appellant challenges his or her conviction as not being supported by sufficient evidence, an appellate court construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus, superseded by constitutional amendment on other grounds in State v. Smith
(1997), 80 Ohio St.3d 89; Thompkins, at 386; Conley, supra. See, also, State v. Woodward, Franklin App. No. 03AP-398,2004-Ohio-4418, at ¶ 16, cause dismissed, 103 Ohio St.3d 1489,2004-Ohio-5606, reconsideration denied, 104 Ohio St.3d 1428,2004-Ohio-6585 (observing that in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility, rather "we essentially assume the state's witnesses testified truthfully and determine if that testimony satisfies each element of the crime").
 {¶ 9} As to the lesser-included offense of involuntary manslaughter, the common pleas court instructed the jury that if it found defendant not guilty of felonious assault, but guilty of the lesser-included offense of assault, and not guilty of child endangering, the jury should find defendant not guilty of murder, and it should consider the lesser offense of involuntary manslaughter. The common pleas court further instructed that before the jury could find defendant guilty of involuntary manslaughter, it had to find beyond a reasonable doubt that Aalaysia's death occurred as a proximate result of defendant's commission of the offense of assault. (Tr. Vol. V, 108-109.)
 {¶ 10} Former R.C. 2903.04, which was in effect at all times relevant to the proceedings, defined "involuntary manslaughter," in pertinent part, as follows:
(B) No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor other than a violation of any section contained in Title XLV of the Revised Code that is a minor misdemeanor and other than a violation of an ordinance of a municipal corporation that, regardless of the penalty set by ordinance for the violation, is substantially equivalent to any section contained in Title XLV of the Revised Code that is a minor misdemeanor.
(C) Whoever violates this section is guilty of involuntary manslaughter. * * * Violation of division (B) of this section is a felony of the third degree.
See, also, State v. Tanner (1993), 90 Ohio App.3d 761, 768, jurisdictional motion overruled (1994), 68 Ohio St.3d 1448
(observing that "[p]roof of intent or lack thereof is not required to obtain a conviction under the [involuntary manslaughter] statute"); State v. Platt, Franklin App. No. 03AP-1148, 2005-Ohio-705, at ¶ 33, appeal not allowed,106 Ohio St.3d 1462, 2005-Ohio-3490, quoting State v. Losey (1985),23 Ohio App.3d 93, 95 (observing that "for purposes of determining culpability for involuntary manslaughter, `"proximate result" bears a resemblance to the concept of "proximate cause" in that defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct'"); Statev. Schaeffer (1917), 96 Ohio St. 215, 220 (stating that "[t]he unlawful act relied upon as the predicate for manslaughter must be the proximate cause of death. If death resulted from any other cause, or there be a reasonable doubt as to the unlawful act being the proximate cause of death, the jury should acquit").
 {¶ 11} As to the lesser-included offense of assault, the common pleas court instructed the jury that if it failed to find that the state proved beyond a reasonable doubt the element of knowingly of the felonious assault offense, then it could consider the lesser-included offense of assault. See, generally, R.C. 2903.11(A)(1) (felonious assault) (providing that no one shall knowingly cause serious physical harm to another). The common pleas court further instructed that before the jury could find defendant guilty of assault, the jury had to find beyond a reasonable doubt that on or about April 23, 2003, defendant recklessly caused serious physical harm to Aalaysia. (Tr. Vol. V., 105.)
 {¶ 12} Former, R.C. 2903.13, which was in effect at all times relevant to the proceedings, defined "assault," in pertinent part, as follows:
(B) No person shall recklessly cause serious physical harm to another * * *.
(C) Whoever violates this section is guilty of assault. Except as otherwise provided in division (C)(1), (2), (3), (4), or (5) of this section, assault is a misdemeanor of the first degree.
 {¶ 13} R.C. 2901.22(C) defines "recklessly" in this manner:
A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
 {¶ 14} Thus, the issues raised by defendant's first assignment of error resolve to (1) whether defendant's conviction for assault of Aalaysia by recklessly having caused serious physical harm to her is supported by sufficient evidence and is not against the manifest weight of the evidence, and (2) assuming defendant's conviction for assault is supported by sufficient evidence and is not against the manifest weight of the evidence, whether defendant's assault of Aalaysia proximately caused Aalaysia's death.
 {¶ 15} According to the state's evidence, Aalaysia, a 14-month-old child, was the daughter of Ms. Chanel Bowman and Mr. Rishon Quander. (Tr. Vol. I, 24; Vol. II, 24.) Approximately two or three weeks before Aalaysia's death in April 2003, Aalaysia and Ms. Bowman, who intermittently dated defendant since she was a high school senior, moved in with defendant. (Tr. Vol. 1, 24-26; Vol. II, 5, 7.)
 {¶ 16} Even before Ms. Bowman and her daughter moved in with defendant, defendant frequently would babysit Aalaysia while Ms. Bowman worked as a cocktail waitress at a strip club. (Tr. Vol. I, 26-27; Vol. II, 17.) According to Ms. Bowman, defendant was "good" with Aalaysia, and Aalaysia did not show any fear or apprehension toward defendant. (Tr. Vol. I, 28; Vol. II, 6.)
 {¶ 17} On the evening of April 22, 2003, after bathing her daughter and getting herself ready for work, Ms. Bowman left the shared residence at approximately 5 p.m. to complete employment applications at potential employers before beginning her shift at the strip club at 7 p.m. that evening. (Tr., Vol. I, 29-30, 75.) According to Ms. Bowman, at the time she left the shared residence, Aalaysia was not sick, was acting "normal," and did not have any bruising across her stomach. (Tr. Vol. I, 75-76.)
 {¶ 18} After Ms. Bowman finished her shift, she left work at approximately 3 a.m. on April 23, 2003. (Tr. Vol. I, 31.) Upon returning to the shared residence, Ms. Bowman remarked to defendant that he had cleaned the house while she was at work. (Tr. Vol. I, 32, 73.) According to Ms. Bowman, the timing of defendant's housecleaning was unusual because defendant typically would clean the house during the daytime. (Tr. Vol. I, 33; Tr. Vol. II, 21, 22-23.) Defendant acknowledged that he had cleaned the house, and also remarked that Aalaysia had become ill while Ms. Bowman was at work. (Tr. Vol. I, 32.) According to Ms. Bowman, defendant informed her that Aalaysia had vomited, and that he had bathed her and cleaned her bedding and clothes. (Tr. Vol. I, 33.)
 {¶ 19} After defendant informed Ms. Bowman that Aalaysia had become ill, Ms. Bowman checked on Aalaysia. (Id.) Ms. Bowman testified: "I walked in there and when I looked at her, she looked fine to me. She was moving around. I thought maybe I had startled her. I didn't want to wake her up. I had on some shirt and jeans. I changed into my night clothes. I didn't turn on a light. Like I turned it on to see if she was okay, but I turned it right back off." (Tr. Vol. I, at 34.) After talking with defendant, Ms. Bowman retired for the night. (Tr. Vol. I, 35.)
 {¶ 20} Ms. Bowman awoke at approximately 10:30 a.m. (Tr. Vol. I, 38) and looked over at Aalaysia's crib and discovered that her eyes were open and that she was not breathing. (Tr. Vol. I, 38-39.) Ms. Bowman testified: "I yelled, `Get her. Something is not right. You need to get her.' So [defendant] grabs her and he puts her in my arms, and she was just so stiff and she was cold, and I'm rubbing her arms trying to make her warm, and I'm, `Aalaysia, get up, Mommy needs you to get up.' So I just immediately started giving her CPR, and the air — her lips were blue, and the air just started coming out of her mouth." (Tr. Vol. I, 39.) Later, Ms. Bowman and defendant called 911, and Ms. Bowman also called her parents. (Tr. Vol. I, 39, 40.)
 {¶ 21} After examining Aalaysia and determining that she was beyond resuscitation, a paramedic pronounced her dead. (Tr. Vol. II, 45-47.) At the scene, firefighters observed bruising in the child's "abdomen or the chest area, a little below the nipple line," and they reported this finding to police. (Tr. Vol. II, 47-48.) Later, the paramedics transferred Aalaysia's body to the morgue. (Tr. Vol. II, 50, 54.)
 {¶ 22} During the course of the police investigation, Detective Sandy Ladley of the Columbus Division of Police queried Ms. Bowman about knuckle prints that were found on Aalaysia's body. (Tr. Vol. I, 40-41; Vol. II, 42; Vol. III, 8, 46, 47; Vol. IV, 90.) Ms. Bowman informed Detective Ladley that she knew nothing about these knuckle prints. (Tr. Vol. I, 41.) At trial, Ms. Bowman denied punching Aalaysia in any way and denied that she hurt Aalaysia. (Tr. Vol. I, 77.)
 {¶ 23} Detective James McCoskey of the Columbus Division of Police, Homicide Squad, testified that, after arriving at the scene, firefighters directed him to the body of Aalaysia. (Tr. Vol. III, 7.) Upon viewing the body, Detective McCoskey observed three or four circular bruises on the upper portion of the child's stomach. (Id.)
 {¶ 24} Using a concealed tape recorder, Detective McCoskey then interviewed defendant at the scene and recorded this interview on an audiotape. (Tr. Vol. III, 8, 24, 34-36.) According to Detective McCoskey, during his first interview with defendant, defendant informed him that, while Ms. Bowman was at work, he cared for Aalaysia. Defendant stated to Detective McCoskey that, while he was caring for Aalaysia, a friend came to his home. Defendant, Aalaysia, and defendant's friend traveled to another house and returned to defendant's home at approximately midnight. After returning home, defendant gave Aalaysia a small cup of milk before putting her to bed. (Tr. Vol. III, 10.) After giving the cup of milk to Aalaysia, defendant left the room. When he returned, he discovered that Aalaysia had vomited. Defendant thereafter cleaned Aalaysia and removed her soiled clothing and toys. (Tr. Vol. III, 11-12.) Defendant then laid the child down to sleep and waited in the living room for Ms. Bowman to return from work. (Tr. Vol. III, 12.) When Ms. Bowman returned home, defendant informed her about the vomiting episode, and defendant later went to sleep. (Id.) Defendant informed Detective McCoskey that Ms. Bowman did not seem concerned about Aalaysia's vomiting episode. (Id.) Defendant further informed Detective McCoskey that after awakening later in the morning, defendant saw that Aalaysia was not stirring and that her eyes were partially opened. After he realized that something was wrong, defendant began administering CPR while Ms. Bowman called 911. (Tr. Vol. III, 14.)
 {¶ 25} After an autopsy was performed on Aalaysia's body, Detective McCoskey contacted defendant and arranged for a second interview. Detective McCoskey also made arrangements with defendant to search the shared residence. (Tr. Vol. III, 15.)
 {¶ 26} However, unlike the first interview, the second interview was not recorded on audiotape. (Id.) During this second interview, Detective McCoskey reviewed the information that defendant had provided during the first interview. (Tr. Vol. III, 16.) At the second interview, defendant provided the name of the friend with whom defendant spent part of the previous night, whose name was "Brione." (Vol. III, 17.) Defendant also temporally referenced the time that Aalaysia vomited by referring to a particular television show. (Id.)
 {¶ 27} Police interviewed defendant a third time. Unlike the previous two interviews, at the time of the third interview, defendant was in police custody after he earlier surrendered himself to police following the issuance of a warrant for his arrest. (Tr. Vol. III, 19, 41.) At this interview, defendant denied harming Aalaysia. (Tr. Vol. III, 26.) Defendant again claimed that he had been with Brione Prince on the evening of April 22, 2003. (Tr. Vol. III, 27.)
 {¶ 28} At trial, Mr. Prince testified that he initially believed he stopped by defendant's home on April 22, 2003, but later he became unsure whether this recollection was correct. Mr. Prince testified: "Originally I thought I did, and then later on I talked to my girlfriend and she said that I had stopped by there on a Monday, but I really — I'm really not exactly for sure, but I thought I stopped on Monday. I'm not for sure." (Tr. Vol. III, 55.) Mr. Prince further testified: "When I stopped over there, I'm not sure which day it was, but I went in the house. I was in the house for about ten minutes, in the front room. We talked, then we both went outside for about ten, fifteen minutes. I gave him a few CD's [sic] and then I left." (Tr. Vol. III, 55; 57.) Mr. Prince also testified that he did not see Aalaysia at that time; he denied taking a drive with defendant or Aalaysia; and he denied that he took defendant and Aalaysia to his parents' home where he had been staying. (Tr. Vol. III, 55-56.)
 {¶ 29} Detective Janel Mead of the Crime Scene Search Unit of the Columbus Division of Police testified on behalf of the state. On direct examination, Detective Mead identified evidence that was recovered from defendant's shared residence (Tr. Vol. III, 67-80.) Detective Mead also testified that she smelled and observed vomit on some of the clothing recovered from defendant's residence. (Tr. Vol. III, 80.)
 {¶ 30} Debra Lambourne of the Columbus Police Crime Laboratory, where she screens biological evidence for biological fluids and performs DNA analysis, testified as an expert witness on behalf of the state. (Tr. Vol. III, 87-88.) According to Ms. Lambourne, blood was found on two items: a peach sheet, and a purple and pink comforter. (Tr. Vol. III, 90.) However, according to Ms. Lambourne, after analyzing this blood under DNA analysis, this blood did not match Aalaysia's blood. (Tr. Vol. III, 96.) Ms. Lambourne testified that she did not have any test to determine whether vomitus was actually present on evidence recovered from defendant's home. (Tr. Vol. III, 91.) When queried as to whether there was any specific way to determine whether something is human vomitus, Ms. Lambourne testified: "I guess past experience on what vomit looks and smells like, generally the smell. I referred to it in my notes as vomit, but I can't scientifically say that is definitely vomit." (Id.) When asked whether the stains on all the recovered clothing looked and smelled like vomitus, Ms. Lambourne testified: "I can't say all of the clothing. Sometimes there were stains present that didn't look like vomit, but possibly could have been blood." (Tr. Vol. III, 92.)
 {¶ 31} Dr. Patrick Fardal, a forensic pathologist in the Franklin County Coroner's Office, also testified as an expert witness on behalf of the state. (Tr. Vol. IV, 7, 8, 11-12). Dr. Fardal testified that Aalaysia Quander's body had "some bruising on her anterior chest[.]" (Tr. Vol. IV, 13.) Dr. Fardal further testified that the bruises were "consistent with a hand or knuckle type of injury that would be a blow with a hand, either open or closed injury, usually the end of someone's fingers or their knuckles." (Tr. Vol. IV, 26.) According to Dr. Fardal, the bruising on the exterior of the chest wall was compatible with the internal injuries that were found, "depending on how the force that caused these injuries was directed in her body." (Tr. Vol. IV, 19.) According to Dr. Fardal, the external bruises were not independently caused by CPR. (Tr. Vol. IV, 72.)
 {¶ 32} Dr. Fardal testified that Aalaysia was probably injured ten to 12 hours before she died. (Tr. Vol. IV, 33.) According to Dr. Fardal, at the time that he examined Aalaysia's body, she had been dead approximately eight to 12 hours. (Tr. Vol. IV, 31.) Within reasonable medical certainty, Dr. Fardal opined that Aalaysia died at approximately 6 a.m. and was injured between 6 and 8 p.m. on the previous night. (Tr. Vol. IV, 44.)
 {¶ 33} Besides externally examining Aalaysia's body, Dr. Fardal also performed an internal examination of the body. (Tr. Vol. IV, 17.) Dr. Fardal testified that he found hemorrhaging throughout Aalaysia's belly, lacerations of the liver, free blood in the abdomen, and hemorrhaging into the structures around the liver, including the small bowel and diaphragm. (Tr. Vol. IV, 17-18.) Dr. Fardal also found hemorrhaging in Aalaysia's right kidney, which, because she was a child, was in close proximity to her liver and small abdominal cavity. There was also a bruise on the lower portion of her right lung, which was near her liver, where the laceration had been found. (Tr. Vol. IV, 18.) According to Dr. Fardal, there also was a little bit of hemorrhaging into Aalaysia's pancreas, which was located in the right upper quadrant of the abdomen. (Id.) Dr. Fardal further testified that he found "hemorrhaging to the first part of [Aalaysia's] duodenum, on the cerosal surface, or the outside of the bowel[.]" (Tr. Vol. IV, 40.) Dr. Fardal also testified that there were "a few flecks of white material [in Aalaysia's stomach], which may or may not be some milk products that were left, but it was basically empty." (Tr. Vol. IV, 71.)
 {¶ 34} Dr. Fardal testified that he also found "approximately four rounded areas of hemorrhage on the back side of her head that were what we call bruises, contusions," (Tr. Vol. IV, 20), and these bruises were "[c]onsistent with a blow to the head. Could be a slap on the top of the head. That's what it's most consistent with." (Id.) Dr. Fardal further explained:
* * * Like I say, it wasn't enough hemorrhage so you could see the bruises on the outside of the body, but they were evident on the inside. And the other thing is any object that has a similar appearance to the hand could cause these injuries, because they're nonspecific as to what actually caused them. Whatever object it was, it would have the appearance of your hand, basically.
(Tr. Vol. IV, 20-21.) However, Dr. Fardal opined that these injuries to Aalaysia's head did not contribute to her death. (Tr. Vol. IV, 39.)
 {¶ 35} According to Dr. Fardal, Aalaysia had no chemicals in her bloodstream at the time of her death. (Tr. Vol. IV, 21.) As to any signs of suffocation or strangulation, Dr. Fardal testified: "I saw no areas of injury to her mouth or the inner aspect of her mouth, and I saw no petechial hemorrhage of her eyes or neck area to indicate she had been compressed in the neck area or had been smothered." (Id.)
 {¶ 36} Based upon his findings, Dr. Fardal concluded, as to Aalaysia's cause of death, that she "suffered a blunt impact to her trunk and the main thing was that she had a laceration of her liver and she had about 150 cc's [sic] of blood in her abdomen at the time of her death." (Tr. Vol. IV, 22.) According to Dr. Fardal, it was fair to say that Aalaysia died when something hit her trunk, causing internal injuries that, in turn, caused her to bleed to death. (Id.) Dr. Fardal opined within a reasonable degree of medical certainty that Aalaysia died due to "[b]lunt impact to the abdomen with subsequent bleeding into the abdomen and injuries to the various organs of her liver, pancreas, stomach and duodenum and kidneys, so she basically had two things, an inflammatory response and a bleeding response." (Tr. Vol. IV, 44-45.)
 {¶ 37} According to Dr. Fardal, "the blow and all this inflammation, et cetera, would cause [Aalaysia] to have a possibility of throwing up. It's one of the signs and symptoms of pancreatitis as it gets worse and worse is nausea and vomiting[.]" (Tr. Vol. IV, 23.) Dr. Fardal testified that, based upon his examination, if a person sustained an injury such as the one sustained by Aalaysia, any vomitus would be composed of whatever stomach contents were present at the time and there would be no source of internal bleeding that would be manifested to the outside. (Id.)
 {¶ 38} As to the amount of force needed to inflict the type of injury that Aalaysia sustained, Dr. Fardal testified:
* * * A minor amount of force could cause this injury. If it was real severe, you would expect more damage to the liver, et cetera, like splitting the liver, et cetera, from the actual blow, so I would say a moderate amount of force or a little bit more would cause this type of injury. The more severe the force is, the more injuries there are. So this patient is kind of in, you know, in between, doesn't have real bad liver injuries. I mean, where they're actually lacerated and you would die fairly quickly, as compared to no injuries at all. I would say moderate is a good amount of force.
(Tr. Vol. IV, 42.)
 {¶ 39} On cross-examination, Dr. Fardal conceded that many different things could have caused the injuries that Aalaysia sustained, and it was possible that the external bruising was unrelated to the internal injuries. (Tr. Vol. IV, 51-52.) On cross-examination, Dr. Fardal also testified that, with respect to Aalaysia's external bruises, it was not possible to precisely determine whether these bruises occurred before or after her death. (Tr. Vol. IV, 55.) When questioned about his estimates about the time of death and the time that Aalaysia was injured, Dr. Fardal conceded that the outside parameter of the time of death was between 5 and 7 a.m. (Tr. Vol. IV, 64), and that the outside parameter of the time of injury was between 1 and 9 p.m. (Id.)
 {¶ 40} In his defense, defendant offered Detective Sandra Ladley of the Homicide Squad of the Columbus Division of Police as a witness. (Tr., Vol. IV, 89.) Detective Ladley confirmed that she was the lead detective on the case and that she interviewed Ms. Bowman. (Tr. Vol. IV, 90.) Detective Ladley testified that, based upon an interview with Ms. Bowman, she concluded that defendant was alone with Aalaysia from approximately 7:00 p.m. on April 22, 2003, until 3 or 3:30 a.m. on April 23, 2003. (Tr. Vol. IV, 95.)
 {¶ 41} Defendant also offered as an expert witness, Dr. Jonathan Groner, Trauma Director of Children's Hospital, in Columbus, Ohio, and an associate professor of clinical surgery at The Ohio State University College of Medicine and Public Health. (Tr. Vol. V, 16-17, 19.) According to Dr. Groner, although he is a board-certified general surgeon, his practice is "mostly limited to children." (Tr. Vol. V, 18.)
 {¶ 42} Dr. Groner opined that, based upon his review of the autopsy report, the liver injury sustained by Aalaysia "look[ed] like a fairly simple injury, in that by the autopsy report it does not involve major vascular structures, meaning arteries and veins, and a half inch isn't really all that deep in the liver; so it's — it would not be considered a severe injury, by what I can determine from this report." (Tr. Vol. V, 22.) According to Dr. Groner, if he were to observe this type of injury at the trauma unit, "a patient with an injury like this would generally require bed rest and intravenous fluids, and possibly, but not terribly likely, a blood transfusion" (id.), and it was "not likely" that an operation would have been required. (Id.)
 {¶ 43} Dr. Groner further testified that the amount of internal bleeding that Aalaysia sustained was of a "moderate level" in terms of severity, "a grade two type blood loss," which was in "the very, very low end of the Grade Two scale." (Tr. Vol. V, 23-24.) Dr. Groner stated that, according to the grading scale, such a hemorrhage was not a fatal hemorrhage. (Tr. Vol. V, 24.) Dr. Groner also testified that Aalaysia's liver injury probably would have been considered a mild injury; that is to say, the injury fell on the low end of a scale that rated liver injuries. (Tr. Vol. V, 24-25.)
 {¶ 44} On cross-examination, Dr. Groner admitted that he had no expertise in determining cause of death (Tr. Vol. V, 30) and had no familiarity with the circumstances of Aalaysia's injury. (Tr. Vol. V, 30-31.) On cross-examination, after reviewing the autopsy report, Dr. Groner also testified: "It's my opinion, based on looking at what's written here, that she had a blunt traumatic injury to the liver[.]" (Tr. Vol. V, 31.) Also, after reviewing autopsy photographs and observing that it was difficult to determine what the pathologist meant by the term "focal hemorrhage," (Tr. Vol. V, 34), Dr. Groner stated that "I agree with [the assistant prosecutor's] position that a liver injury can come from a blow to that region." (Id.) Also, Dr. Groner admitted that, for a child in the age group of Aalaysia if a child were in shock, and if a child were vomiting and had four concentric bruises on her chest right below her midline, suspicion that an injury was intentionally inflicted would be high, and he would have alerted hospital staff who, in turn, would have contacted Children Services. (Tr. Vol. V, 34-35.) Dr. Groner also testified that it was fair to say that a combination of hemorrhaging and symptoms such as shock, vomiting, and dehydration, could be fatal. (Tr. Vol. V, 39.)
 {¶ 45} After having been shown exhibits with stains, Dr. Groner testified:
I think the — well, what you have over here looks more like formula and stuff, not necessarily all that disconcerting. What's over there looks like quite a bit, and this green tinge to it is the type of thing that surgeons tend to worry about, because that means that it's more than just vomiting from the stomach. It's actually intestinal contents coming up. Surgeons, when we see that dark green amount, we tend to worry about serious injury. The dark cast up there, that's concerning, whereas what you've shown me here looks like formula and food and stuff.
(Tr. Vol. V, 41.)
 {¶ 46} Defendant presented no other witnesses in his defense and defendant himself did not offer testimonial evidence. However, defendant did display his hands to the jury without comment. (Tr. Vol. V, 45.)
 {¶ 47} In a criminal or civil trial, determination of the weight to be given the evidence and determination of witness credibility are primarily for the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. In Woodward, supra, this court explained:
* * * [T]he jury is free to believe all, part, or none of the testimony of each witness who appears before it. State v. Long
(1998), 127 Ohio App.3d 328, 335. The jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony. State v. Wright,
Franklin App. No. 03AP-470, 2004-Ohio-677, at ¶ 11. Thus, a reviewing court may not second guess the jury on matters of weight and credibility. Id.
Id. at ¶ 18.
 {¶ 48} In Bourjaily v. United States (1987), 483 U.S. 171,107 S.Ct. 2775, the Supreme Court of the United States stated that a simple fact of evidentiary life provides that: "[i]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." Id. at 179-180.
 {¶ 49} Here, although there is no direct evidence showing that defendant inflicted a blow to Aalaysia that proximately resulted in her death, the evidence in cumulation and reasonable inferences drawn from the evidence support the jury's verdict that defendant committed assault and involuntary manslaughter.
 {¶ 50} According to the evidence, Ms. Bowman left the shared residence on April 22, 2003, at approximately 5 p.m., and when she departed, she left her daughter in the care of defendant. When she left home that evening, her daughter was in her usual state of health. According to the evidence, defendant cared for Aalaysia while defendant was at work.
 {¶ 51} During a police interview, defendant told police that on the evening before Aalaysia died, a friend, who was later identified as Brione Prince, came by the house and defendant, Aalaysia, and Mr. Prince took a drive together. However, at trial, Mr. Prince did not corroborate defendant's statement to police. According to Mr. Prince, although he was uncertain of what day he visited defendant, he was certain that when he visited defendant, he did not see Aalaysia, and he, defendant, and Aalaysia did not take a trip together on that day.
 {¶ 52} Accordingly, in the absence of Mr. Prince's corroboration of defendant's statement to police about the events of April 22, 2003, the jury, as the trier of fact, reasonably could find that defendant's credibility was diminished and reasonably could place little weight on defendant's statement to police about his whereabouts on that date, as well as defendant's account of the events of that evening.
 {¶ 53} Additionally, according to the coroner, Aalaysia sustained a blunt impact to her trunk, which caused internal injuries, which in turn caused Aalaysia to bleed to death. The coroner also found bruising on Aalaysia's abdomen "consistent with a hand or knuckle type of injury that would be a blow with a hand, either open or closed injury, usually the end of someone's fingers or their knuckles." (Tr. Vol. IV, 26.) Within reasonable medical certainty, the coroner opined that Aalaysia died at approximately 6 a.m., and was injured between 6 and 8 p.m. the previous night. (Tr. Vol. IV, 44.)
 {¶ 54} Based upon the evidence and reasonable inferences drawn therefrom, Aalaysia was injured at the same time that defendant was babysitting her. Furthermore, the bruising on Aalaysia's abdomen was consistent with a blow by a hand. Therefore, a jury reasonably could infer that defendant inflicted a blow with his hand upon Aalaysia, which in turn caused internal bleeding, which resulted in her death.
 {¶ 55} Moreover, because defendant's own expert witness testified that the amount of vomitus and its green tinge found on some exhibits were a cause for serious concern, a jury reasonably could conclude that defendant's failure to seek medical treatment for Aalaysia, after he apparently struck her, constituted heedless indifference to the consequences of defendant's action toward Aalaysia.
 {¶ 56} Based upon this evidence and reasonable inferences drawn from the evidence, we find that a jury reasonably could conclude that defendant recklessly caused serious physical harm to Aalaysia. Defendant's infliction of a blow to an approximately 14-month-old child with sufficient force to cause internal injuries constitutes heedless indifference to the consequences of such an action. Furthermore, defendant's failure to seek medical treatment for Aalaysia in the face of dark green-tinged vomitus, which presumably was related to her internal injuries following defendant's striking of Aalaysia, constitutes a disregard of a known risk.
 {¶ 57} Consequently, for the foregoing reasons, we cannot conclude that, in resolving evidentiary conflicts, the jury clearly lost its way, thereby creating a manifest miscarriage of justice when it found defendant guilty of assault. Furthermore, construing the evidence in favor of the prosecution, we conclude that the evidence permits any rational trier of fact to find the essential elements of assault beyond a reasonable doubt.
 {¶ 58} Besides concluding that defendant's conviction for assault was not against the manifest weight of the evidence and defendant's conviction for assault was not supported by insufficient evidence, we also conclude that defendant's conviction for involuntary manslaughter also was not against the manifest weight of the evidence and therefore was not supported by insufficient evidence.
 {¶ 59} Here, Aalaysia was approximately 14 months old at the time of the assault, and defendant's blow to her abdomen caused internal injuries and bleeding, which in turn resulted in her death. Under the facts and circumstances of this case, we find that Aalaysia's death was a foreseeable consequence which was known to be, or should have been known to be, within the scope of the risk created by defendant's blow to the abdomen of a child of such tender years. Consequently, we find that the jury reasonably could conclude that defendant's assault of Aalaysia proximately caused her death. Moreover, based upon our review of the evidence, we cannot conclude that in resolving evidentiary conflicts, the jury clearly lost its way, thereby creating a manifest miscarriage of justice when it found defendant guilty of involuntary manslaughter. Construing the evidence in favor of the prosecution, we also conclude that the evidence permits any rational trier of fact to find the essential elements of involuntary manslaughter beyond a reasonable doubt. Accordingly, we conclude that the involuntary manslaughter conviction is supported by sufficient evidence.
 {¶ 60} Accordingly, having found that the convictions for assault and involuntary manslaughter are supported by sufficient evidence and are not against the manifest weight of the evidence, we overrule appellant's first assignment of error.
 {¶ 61} By his second assignment of error, appellant asserts the common pleas court erred by failing to state its reasons for imposing more than the minimum sentence to an offender who previously had not been imprisoned and by imposing more than the minimum sentence when there were no proven facts to support such a sentence. For its part, the state concedes that the matter should be remanded for resentencing; however, the state's concession was made prior to State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, reconsideration denied, 109 Ohio St.3d 1408,2006-Ohio-1703.
 {¶ 62} In Foster, the Supreme Court of Ohio held that "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at paragraph seven of the syllabus; see, also, id. at paragraph one of the syllabus (holding that R.C. 2929.14[B] and [C] and 2929.19[B][2] are unconstitutional because these provisions require judicial fact-finding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of defendant).
 {¶ 63} Recently, in State v. Draughon, Franklin App. No. 05AP-860, 2006-Ohio-2445, which was rendered after Foster, this court considered whether a trial court erred by failing to make required findings under R.C. 2919.14(C) to support the imposition of a non-minimum sentence. Id. at ¶ 9. Observing that, underFoster, trial courts are no longer required to make R.C.2919.14(C) findings before imposing a non-minimum sentence, this court overruled the appellant's claim of error. Draughon, at ¶ 9.
 {¶ 64} In the present case, we cannot conclude that a common pleas court's failure to follow an unconstitutional statute constitutes reversible error. Applying Draughon, we therefore overrule that portion of defendant's second assignment of error, wherein he claims the common pleas court erred by failing to state its reasons for imposing more than the minimum sentence to an offender who previously had not been imprisoned.
 {¶ 65} Defendant's second assignment of error also asserts that the trial court erred by imposing more than the minimum sentence when there were no proven facts to support such a sentence, thereby violating the principles of Apprendi v. NewJersey (2000), 530 U.S. 466, 120 S.Ct. 2348, and Blakely v.Washington (2004), 542 U.S. 296, 124 S.Ct. 2531, rehearing denied, 542 U.S. 961, 125 S.Ct. 21. See, generally, Blakely, at 303 (stating that "[o]ur precedents make clear, however, that the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the factsreflected in the jury verdict or admitted by the defendant") (emphasis sic); Foster, supra, at ¶ 7.
 {¶ 66} Blakely was decided on June 24, 2004, before defendant's sentencing hearing on July 15, 2004. At the sentencing hearing, defendant failed to raise a Blakely
challenge. In Draughon, supra, this court "[held] that aBlakely challenge is waived by a defendant sentenced afterBlakely if it was not raised in the trial court." Id. at ¶ 8. Because Blakely was decided prior to defendant's sentencing hearing, because defendant could have objected to his sentencing based upon Blakely; and because defendant failed to assert aBlakely challenge at the sentencing hearing, applyingDraughon, we therefore conclude defendant has waived hisBlakely challenge for purposes of this appeal. Therefore, for the foregoing reasons, we overrule that portion of defendant's second assignment of error wherein he claims that the trial court erred by imposing more than the minimum sentence when there were no proven facts to support such a sentence. See, also, State v.Payne, Franklin App. No. 05AP-517, 2006-Ohio-2552, at ¶ 6.
 {¶ 67} Accordingly, having found both claims contained in defendant's second assignment of error to be without merit, we overrule defendant's second assignment of error.
 {¶ 68} By his third assignment of error, defendant asserts that, according to R.C. 2929.41(A), the common pleas court erred by failing to state in its judgment that defendant's misdemeanor sentence should be served concurrently with defendant's felony sentence. The state disputes defendant's construal of R.C.2929.41. However, given its earlier pre-Foster concession that the matter should be remanded to the common pleas court for resentencing, the state urges us to find defendant's third assignment of error to be moot because the state reasons that defendant will be able to advocate for correction of any perceived errors in the judgment entry upon remand.
 {¶ 69} In Foster, the Supreme Court of Ohio observed that "Ohio appears to be unique in having a rule that sentences of imprisonment shall be served concurrently." Id. at ¶ 66. See, also, State v. Barnhouse, 102 Ohio St.3d 221, 2004-Ohio-2492, at ¶ 11. However, after examining Ohio's felony sentencing statutes and determining that all references to mandatory judicial fact-finding properly could be eliminated in the four areas of concern under review, id. at ¶ 96, the Foster court reasoned that "[w]ithout the mandatory judicial fact-finding, there is nothing to suggest a `presumptive term.'" Id. TheFoster court therefore concluded: "The following sections, because they either create presumptive minimum or concurrent terms or require judicial fact-finding to overcome the presumption, have no meaning now that judicial findings are unconstitutional: R.C. 2929.14(B), 2929.19(B)(2), and 2929.41.These sections are severed and excised in their entirety[.]" Id. at ¶ 97. (Emphasis added.) See, also, id., supra, at paragraph three of the syllabus (holding that R.C. 2929.41[A] is unconstitutional).
 {¶ 70} Because the Foster court held that R.C. 2929.41(A) is unconstitutional, id. at ¶ 97, and because Foster severed and excised R.C. 2929.41 in its entirety, defendant's reliance upon R.C. 2929.41 in support of his third assignment of error is not convincing.
 {¶ 71} Besides asserting that the common pleas court erred by failing to adhere to R.C. 2929.41(A), defendant also claims that the trial court's judgment is ambiguous. According to defendant, the sentencing entry is unclear as to whether defendant was sentenced to a four-year prison term for the involuntary manslaughter conviction, or whether defendant was sentenced to three and one-half years of imprisonment for the involuntary manslaughter conviction and six months of imprisonment for the assault conviction. Defendant further asserts that, because the trial court stated that defendant should receive "time served" for the assault conviction, the department of rehabilitation and correction may construe the judgment entry as indicating that, of the 444 days of jail-time credit, 180 days of jail-time credit may not be applied toward defendant's four-year sentence for the involuntary manslaughter conviction.
 {¶ 72} Defendant does not, however, challenge whether the common pleas court's award of "time served" for the assault conviction is itself error. Neither has the state challenged the trial court's award of "time served." See, e.g., State v.Baker, 152 Ohio App.3d 138, 2002-Ohio-7295, at ¶ 12 (stating that "[p]revious to Am.Sub.S.B. No. 2, it was a regular practice in felony sentencing to impose a prison sentence, suspend the sentence, and then impose terms of probation. * * * The currentfelony sentencing statutes, contained primarily in R.C. 2929.11to 2929.19, require a judge either to impose a prison term orimpose community-control sanctions"). (Emphasis added.) Because neither defendant nor the state has raised whether the common pleas court erred by awarding "time served" for the assault conviction, we decline to sua sponte address this issue here.
 {¶ 73} For its part, the state contends that the judgment entry clearly conveys that defendant was sentenced to a four-year prison sentence for the involuntary manslaughter conviction with 444 days of jail-time credit. The state further contends that, because defendant was awarded "time served" for the assault conviction, it was unlikely that the department of rehabilitation and correction would change the involuntary manslaughter conviction to three and one-half years of imprisonment or four and one-half years of imprisonment.
 {¶ 74} In State v. Porterfield, 106 Ohio St.3d 5,2005-Ohio-3095, the Supreme Court of Ohio instructed:
* * * [N]o clear standard has evolved to determine the level of lucidity necessary for a writing to be unambiguous. Some courts have reasoned that when multiple readings are possible, the provision is ambiguous. * * * The problem with this approach is that it results in courts' reading ambiguities into provisions, which creates confusion and uncertainty. When confronted with allegations of ambiguity, a court is to objectively and thoroughly examine the writing to attempt to ascertain its meaning. * * * Only when a definitive meaning proves elusive should rules for construing ambiguous language be employed. Otherwise, allegations of ambiguity become self-fulfilling.
Id. at ¶ 11.
 {¶ 75} Here, we cannot conclude that a definitive meaning of the judgment entry proves elusive, even though the common pleas court did not specify whether defendant's sentences should be served concurrently or consecutively. After imposing a four-year prison sentence for the involuntary manslaughter conviction and a six-month sentence for the assault conviction, the trial court determined that defendant had served sufficient time for the assault conviction. The trial court also found that defendant had 444 days of jail-time credit. Because the common pleas court determined that defendant had served sufficient time for the assault conviction, we therefore conclude that the trial court's calculation of 444 days of jail-time credit must be applied toward defendant's four-year prison sentence for the involuntary manslaughter conviction.
 {¶ 76} Consequently, notwithstanding defendant's claims to the contrary, we do not conclude that a definitive meaning of the common pleas court's judgment entry proves elusive such that remanding the matter to the common pleas court for resentencing is required. Therefore, for the foregoing reasons, we overrule defendant's third assignment of error.
 {¶ 77} Accordingly, having overruled all three of defendant's assignments of error, we therefore affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Brown and McGrath, JJ., concur.