DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Terry Lee Lampkin, Jr., appeals the judgment of the Lucas County Court of Common Pleas. For the following reasons, the judgment is affirmed.
 {¶ 2} Appellant was indicted for two counts of aggravated robbery, a violation of R.C. 2911.01(A)(3) and a felony of the first degree, and two counts of felonious assault, a violation of R.C. 2903.11(A)(1) and a felony of the second degree. At trial, the following evidence was adduced. On December 11, 2005, at approximately 2:00 p.m., three young women, Tyra Slaughter, Charlene Redmond, and Shinina Webb, were vacuuming a car at *Page 2 
the car wash on the corner of Detroit Avenue and Council Street in Toledo, Ohio. Slaughter and Redmond testified that when they arrived, they saw four black males walk into the car wash through the car exit of the car wash. Tyra thought they were going to work. Approximately 15 minutes later, they saw the four men exit, walk to the stop sign at the corner of Detroit, then begin running.
 {¶ 3} Michael Clarkson, the car wash owner, and George Hart, the manager, were in the car wash at that time. Business had been slow, and Hart was working alone that day. Clarkson came into the office a short time before in order to pick up cash from the safe for a bank deposit. Both testified that four men, wearing mostly black and all wearing ski masks, forcefully entered the office door of the car wash. Two men grabbed and started beating Clarkson, and two men grabbed and started beating Hart. The men riffled through both Clarkson's and Hart's pockets; they took approximately $1,400 in cash from Clarkson and $250 from Hart.
 {¶ 4} Hart testified that about 15 minutes before the assault, appellant had been in the car wash. A woman Hart did not know was driving and appellant was the front seat passenger. Hart knew appellant from prior dealings with him at the car wash and Hart had sold appellant a car a few years before. Hart said he had had about six or seven conversations with appellant over the past few years. When appellant came for a car wash that day, appellant asked Hart "where everybody was at," and "where the owner was." Hart told appellant that no one else was there and that he was working alone.
 {¶ 5} Thus, while two of the assailants were beating Hart, and one told Hart to give up his money, Hart recognized the voice as appellant's. Hart said, "Terry, is that *Page 3 
you?" He asked appellant why he was beating him; appellant did not answer but instead started to kick and beat appellant more.
 {¶ 6} A moment after the four men started to run, Slaughter, Redmond and Webb saw Michael Clarkson, the car wash's owner, exit the office door of the car wash. He was bleeding profusely from a wound on his forehead. Clarkson got into his car, turned it around in the street, re-entered the car wash parking lot and pulled up to the office. Clarkson testified that he wanted to see where the four men had gone, but then decided to turn back. A moment later, the three women saw Hart exit the office door, badly injured and covered in blood; Hart collapsed immediately after exiting. Redmond and Slaughter called 911 from a cell phone and, because of Hart and Clarkson's injuries, reported that someone had been shot. Clarkson also called 911 from his cell phone.
 {¶ 7} Clarkson and Hart testified that the four men were wearing black knit ski masks, with three holes cut out for the eyes and mouth. Clarkson and Hart thought that the four men were all about five feet and six to seven inches tall. Slaughter, Redmond and Webb all thought the four men were African-American, despite their heavy clothing and masks. Slaughter and Redmond characterized them as "boys" in their 911 call, based on their impression of their body types, but testified that they could not tell if they were teenagers or young men.
 {¶ 8} Sergeant Mark Fry testified that he was dispatched first to the car wash, then to an address on Rosewood to secure evidence. Rosewood is a residential street situated diagonally southwest from the car wash. There, officers found footprints in the snow, two pairs of gloves with blood on them (total of four gloves), and blood drops in *Page 4 
the snow. Two sets of shoe tracks were observed in the snow. Fry arrived at the Rosewood location approximately 20 minutes after his arrival at the car wash.
 {¶ 9} Officer Robert Britt testified that he and Officer Andrew Bills received a dispatch to the car wash while on patrol and were the first responders to the scene. They interviewed the three women witnesses and Clarkson. Clarkson reported that the four suspects were juveniles and each of the three women witnesses thought they were 13 to 14 years old.
 {¶ 10} Officer Katrina Welch testified that she and her partner, Officer Powell, arrived at the car wash soon after Britt and Bills. They surveyed the area and saw footprints in the snow leading from the car wash into the adjoining neighborhood. They followed the footprints for two to three blocks but the trail proved fruitless. She thought there were either one or two sets of footprints and did not remember seeing any blood on the ground.
 {¶ 11} Mary Faris was working that day at the Monroe Carry-Out on the corner of Monroe and Bancroft Streets, approximately one-half mile from the car wash. She knew appellant as a regular customer of the carry out and was able to identify him. She remembered appellant entering the carry out that day, saw him wearing a dark sweater, said hello, but did not notice anything unusual. Police entered the carry out a few minutes after appellant left.
 {¶ 12} Anthony Brown, an employee at the Monroe Carry-Out, was working behind the counter that day. He also knew appellant and was able to identify him. He did not notice anything unusual about appellant, except that he was not wearing a coat or *Page 5 
jacket in the cold weather. He conversed briefly with appellant; appellant told Brown that his car "just went down" and he asked two women standing close by if he could have a ride. Appellant bought cigarettes and asked Brown for a paper towel. Brown testified that appellant's clothes were clean and he was not breathing heavily.
 {¶ 13} The state introduced into evidence a video surveillance camera recording taken while appellant was in the carry out. It shows appellant in the carry out at 2:08 p.m., not wearing a coat, hat, or gloves. After taking some paper towels from Brown, appellant blew his nose and wiped his face and hands repeatedly before leaving.
 {¶ 14} Lisa Glanz, a Toledo resident, was driving home and had exited the expressway at Detroit Avenue by Monroe Street. She saw police cars with their overhead lights on at the car wash. She drove down Monroe Street and had just turned onto Bancroft Avenue, when she saw someone running out of Hollywood Street, run across Bancroft, and then continue to run across a field on the other side of Bancroft. She described the person as a black male, wearing no coat and dark pants and a dark sweater. Because the police presence at the car wash had piqued her curiosity, she drove around the block of Glenwood Avenue and back up Monroe Street. She then saw the same man cross Monroe Street and saw his profile, noted that he had "kind of like ringlets in his hair," and saw him head towards the Monroe Carry-Out. She noted his profile because she intended to call police and wanted to give a good description. She then went home and called police. Later that evening, she saw a picture of appellant on the evening news and told her husband that that was the same man she saw running across the street. That *Page 6 
Wednesday, she went to the police station and was shown a photo array of six pictures, one of which was appellant. She identified appellant because of the "ringlets" in his hair.
 {¶ 15} Detective Terry Cousino testified to his recovery of a bloodstained coat liner found behind a garbage can in the alley between Whitney Avenue and Rosewood Avenue. He also testified to his recovery of some clothes, found stuffed underneath a tree stump in the backyard of a residence on Hollywood Avenue. A black knit face mask and hat, a pair of gray sweat pants, and a maroon hooded sweatshirt comprised the clothes. Cousino also took and processed for evidence two DNA swabs from appellant and Hart.
 {¶ 16} Detective William Seymour testified that he spoke with Hart at the hospital when Hart identified appellant as his assailant. Afterwards, he and Detective Quinn looked for appellant at an address on Kimball Street, approximately one and one-half miles from the car wash. Appellant's wife answered their knock, and she gave permission for the detectives to search their residence, the garage and a vehicle. In a drawer in what appeared to be the main bedroom, officers found a black face mask. The package wrap for the face mask was found in a garbage can in the garage.
 {¶ 17} The four gloves, the black ski mask, and the coat, each found in the area between Whitney Avenue and Hollywood Avenue, were submitted for DNA analysis. Testing of the inside of one glove showed appellant to be the major contributor, and a stain on the outside of that same glove showed Hart, the victim, to be the major contributor. Stains on the other gloves showed Hart to be the major contributor, with DNA mixtures of two other unknown individuals appearing. Swabs from the black ski *Page 7 
mask yielded Hart's DNA. Swabs from the coat were a mixture of appellant, Hart, and two other unknown individuals.
 {¶ 18} Appellant testified that he and his wife had gone to the car wash earlier that morning, and had spoken briefly to Hart; appellant explained that he had known Hart only through brief encounters at the car wash. When asked about how his DNA could have gotten on the pair of gloves in evidence, he explained that several of his nephews were living with him, that the gloves belonged to one of his nephews, and that appellant had occasionally worn the gloves to do household chores. When asked how he happened to be in the car wash area during the time frame relevant to the robbery and identifications, appellant explained that one of his nephews called him and asked him to pick him up at a U-Haul near Detroit Avenue and Monroe Street because he was in trouble with the police. He claimed to have parked his car there, walked to the Monroe Carry-Out, pretended that his car broke down, got a ride back to the area of his car from a woman at the carry-out, found that his nephew had not hidden in his car, and drove home. He explained that he was "lollygagging" in the carry-out in order to give his nephew time to hide in his car at the U-Haul lot; he admitted seeing the police walking into the carry-out as he was exiting, and did not tell them about his nephew. Appellant was also questioned extensively regarding his multiple prior convictions, including an aggravated robbery conviction.
 {¶ 19} The jury returned verdicts of guilty to each count. At sentencing, the count found that the convictions for felonious assault merged with the convictions for aggravated robbery as allied offenses. The court imposed a term of ten years *Page 8 
incarceration for each of the aggravated robbery convictions. The terms were ordered to run consecutively for a total of 20 years incarceration.
 {¶ 20} Appellant assigns two errors for review:
 {¶ 21} "I. The evidence was insufficient to support appellant's conviction and the conviction was against the manifest weight of the evidence.
 {¶ 22} "II. Lampkin was denied effective assistance of counsel in violation of his rights guaranteed under Article I, Section 10 of the Ohio Constitution and the Sixth Amendment of the United States Constitution."
 I. {¶ 23} First, appellant argues both that insufficient evidence supported his convictions and that his convictions were against the manifest weight of the evidence. Convictions based on insufficient evidence violate a criminal defendant's right to due process of law. We are required to construe the evidence in favor of the prosecution and determine whether the evidence would enable any rational trier of fact to find beyond a reasonable doubt the essential elements of the offense.State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by constitutional amendment on other grounds in State v.Smith (1997), 80 Ohio St.3d 89.
 {¶ 24} With respect to the manifest weight of the evidence, a reviewing court questions "`whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" State v. Group, *Page 9 98 Ohio St.3d 248, 2002-Ohio-7247, ¶ 77, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. The appellate court considers all of the evidence, sits as a "thirteenth juror," and decides whether a greater amount of credible evidence supports an acquittal such that the jury "clearly lost its way" in convicting the appellant. State v.Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 25} After reviewing the entire record, we find that appellant's convictions are supported by the manifest weight of the evidence and are supported by sufficient evidence. A map introduced into evidence by the state, together with a chronology established by DNA evidence and witness testimony, clearly shows a path followed by the persons who committed the robbery and assaults at the car wash. After assaulting and robbing Hart and Clarkson near Council Street and Detroit Avenue, the person or persons ran southwest through a residential neighborhood, between Whitney Avenue and Rosewood Avenue. In this neighborhood, a coat and two pairs of gloves were found along a trail of footprints. Bloodstains on these items matched both appellant's and Hart's DNA. The persons then continued to move southwest through the neighborhood to Hollywood Avenue, discarding more clothing between Rosewood and Hollywood Avenues.
 {¶ 26} Appellant was seen exiting Hollywood Avenue from the south, running across Bancroft Street, where he was seen by Glanz. Glanz then looped around the block between Bancroft Street and Monroe Street, while appellant continued to run through that block to the southeast. Glanz again saw appellant when he exited that block and crossed *Page 10 
Monroe Street, heading southeast towards the Monroe carry out; she specifically testified that she saw appellant cross Monroe Street at 2:07 p.m.
 {¶ 27} Security surveillance cameras at the Monroe Carry Out show appellant entering at 2:08 p.m. Although Brown, working behind the counter that day, testified that appellant was not sweaty or out of breath, the recording clearly shows appellant requesting paper towels from him, then standing in front of the counter for several minutes, pacing and wiping his hands and face repeatedly with the paper towels. While appellant's behavior on the surveillance recording may have been consistent with his explanation of waiting for a nephew in trouble, the jury, as fact-finder, could have made alternative inferences consistent with appellant's guilt.
 {¶ 28} Last, Hart positively identified appellant as one of the assailants; both Hart and appellant acknowledged being acquainted with one another. While appellant attempts to minimize their acquaintance to argue that Hart's voice identification was unreliable, Hart testified they were on a first-name basis. They had spoken earlier that same day.
 {¶ 29} Cumulatively, the evidence was sufficient to enable the jury to find, beyond a reasonable doubt, that appellant was one of the four perpetrators. Appellant's explanations as to his activities that day provided the bulk of the evidence weighing against his convictions; the jury as fact-finder was entitled to render credibility determinations and give his testimony little credence or weight. The greater amount of evidence supports his conviction, and this is not the exceptional case where the evidence *Page 11 
weighs heavily against the convictions. Appellant's first assignment of error is therefore not well-taken.
 II. {¶ 30} Next, we address appellant's claim that his trial counsel rendered ineffective assistance such that he was deprived of his right to counsel. In order to establish ineffective assistance of counsel, an accused must show: (1) that his trial counsel's performance was so deficient that the attorney was not functioning as the counsel guaranteed by the Sixth Amendment of the United States Constitution; and (2) that counsel's deficient performance prejudiced the defense.Strickland v. Washington (1984), 466 U.S. 668, 687. Prejudice is shown where there is a reasonable probability that a different result would have occurred in the case if the attorney had not erred. State v.Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus.
 {¶ 31} Appellant advances two arguments supporting this assigned error. First, he argues that his trial counsel only had six weeks to prepare and should have asked to continue the trial to further prepare. Second, he argues that, from his point of view, his counsel acted against his interests by failing to call three witnesses to testify: an independent DNA expert who analyzed the state's evidence, his wife, and a third person. Appellant explained in chambers the conflict between himself and appellant, noting that this third person was "presently in custody * * * there are issues I have with this proposed testimony and his * * * where he is and the looks of it in terms of him being incarcerated presently." *Page 12 
 {¶ 32} "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel."Morris v. Slappy (1983), 461 U.S. 1, 11. "There is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." State v. Hancock, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 109, quoting United States v. Cronic (1984), 466 U.S. 648, 659, fn. 26. Appellant does not allege specific errors his counsel made due to a lack of preparation time. Therefore, this argument has no merit.
 {¶ 33} With respect to his counsel's alleged "failure" to call witnesses: Appellant's counsel expressed that it would have been against appellant's interests to call these witnesses for several reasons. First, appellant's counsel told the court that the independent DNA analyst reported results consistent with the state's results. Counsel stated that he spent time speaking with and meeting in Columbus with, the independent analyst and the laboratory director seeking clarification of the results. Counsel did not want to risk having another, independent expert confirm the state's DNA findings.
 {¶ 34} Second, appellant's counsel did not want to call appellant's wife as a witness out of concern that she would have had to testify consistently with her previous statements made to the police when appellant was arrested at home: "I do not want to be a part of placing somebody on the record who is going to testify to something other than what she told the police * * *." Counsel was, apparently, expressing a worry that appellant's wife would have committed perjury. Even if her testimony would not have constituted perjury, however, appellant's counsel also expressed concern that her previous *Page 13 
statements would be admitted and call into question appellant's testimony regarding his version of events into question.
 {¶ 35} While appellant may have disagreed with his trial counsel's strategy in not calling these witnesses, the "Sixth Amendment does not guarantee `rapport' or a `meaningful relationship' between client and counsel." State v. Ketterer, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 101. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the trial." State v.Cook (1992), 65 Ohio St.3d 516, 524. Given counsel's explanations, which appellant did not contest, counsel acted reasonably in not calling these witnesses, and also acted in appellant's interest. The Sixth Amendment guaranteed appellant a professionally competent, effective representation. That is what he received. Appellant's second assignment of error is not well-taken.
 {¶ 36} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED. *Page 14 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
 Arlene Singer, J., William J. Skow, J., Thomas J. Osowik, J., CONCUR. *Page 1